ELIZABETH DREW BROWN ET AL. *v.* MAGUIRE'S REAL ESTATE AGENCY and JAMES H. MAGUIRE, Defendants, FIRST NATIONAL BANK in St. Louis (Garnishee) Appellant, RUTHERFURD BINGHAM ET AL., ROY RUTHERFURD ET AL., MRS. ROBERT B. (ELIZA H.) LAWRENCE ET AL. (Claimants) Appellants.—121 S. W. (2d) 754.

Division One, November 19, 1938.

*Fordyce, White, Mayne, Williams & Hartman, Walter R. Mayne* and *Joseph R. Long* for First National Bank in St. Louis.

338

*Wm. H. Killoren, Salkey & Jones* and *Sam Elson* for Rutherfurd Bingham et al.

*Leahy, Walther, Hecker & Ely* and *J. L. London* for respondents.

HYDE, C.—This case, recently reassigned to the writer, is a garnishment proceeding against the First National Bank as garnishee, seeking to have property and credits of James H. Maguire and Maguire's Real Estate Agency applied to payment of plaintiffs' $4347.36 judgment. Interpleas were filed by certain persons, who were not parties, claiming $4000 of the fund. Garnishee claimed the right to apply the whole deposit to the payment of the Agency's note to it. The court found against garnishee and interpleaders, and en-

tered judgment for plaintiffs against garnishee for $4187.55, the full amount of these deposits. Garnishee and interpleaders appealed to the St. Louis Court of Appeals. On dissent of one of the judges the case has been certified here. [Brown v. Maguire's Real Estate Agency, 101 S. W. (2d) 41.]

Interpleaders contend that the judgment cannot stand because it gives their property to plaintiffs; while garnishee claims that it has the right of set-off of all deposits as a matter of law. Garnishment was served January 4, 1933. At that time, the Agency had on deposit $93.65; Mr. Maguire only had forty cents. The next day, before it knew of the garnishment, the Agency made a deposit of $4093.50. Of this amount, $4000 was a check, drawn on garnishee by Middleton Theatre Company, dated January 3, 1933, payable to the order of Maguire's Real Estate Agency. This check was given to pay a quarterly payment, due on interpleaders' 99-year lease, which the Agency was authorized to collect for and remit to them. The Agency had only one bank account and deposited in it all checks received from every source. The Agency collected rentals on different properties for many clients and deposited them all in this account. It was shown that this was the customary method of St. Louis real estate agencies making such collections. Mr. Maguire, who had been engaged in the real estate business for 50 years, was the sole owner of the Agency, which he said was a common law trust with one share in his wife's name.

Mr. Maguire testified as follows:

"I collected (interpleaders') rent quarterly, always by a check for $4000. I first took the check and deposited it in the bank and then distributed it to the different heirs. I would deposit it in the name of Maguire's Real Estate Agency in the First National Bank, after which we would distribute the money according to the various interests; . . . most of them, except two or three, were out of the city. Those who resided out of the city got paid by drafts and these in the surrounding country were by check, which would be drawn on the Maguire's Agency account. To obtain the drafts sent to the Eastern heirs we would make out a check to the bank covering the interest of the Eastern heirs and then distribute the drafts. . . . We received a commission for rents we collected and we would remit to the various clients of the Agency by checks, except to out-of-town clients, to whom we sent drafts. . . . We would pay them generally monthly. We usually distributed the $4000 check more promptly than any other. We would not draw on it on the same day of the deposit, but generally the first of the month, sometimes as much as two weeks later. . . . I drew a check against the same account to pay my salary, the office expenses, and sometimes the taxes on my home. As a rule, I did not pay my home

gas bill from this account, but sometimes I did. We used this account for whatever we saw fit. Our commissions went into this account, and naturally we checked against it. Our method of handling these accounts was never questioned before, and none of the Rutherfurd people told us not to handle it in that way. We had been handling it the same way for years.''

The Agency owed garnishee a note for $4000 executed November 30, 1932, in renewal of a previous note. This indebtedness had amounted to $8500 in 1929. It was secured by two trust deeds and notes held as collateral. By 1931, it had been reduced to $5500 and it was thereafter further reduced by $250 principal payments at each renewal up to May, 1932. Nothing was paid after that time except interest. Mr. Harmon, garnishee's vice-president who supervised the Agency's loan, said: ''Every time the note matured I made demand on Mr. Maguire to reduce it. It matured three times in 1932 and I made three requests for reduction, to which he replied he had no money.''

Mr. Harmon further testified as follows:

''When the note would be renewed I would have before me the general average balance for four or five months prior to renewal. I have no definite information as to the average daily balance in October, 1932, but it was a very nominal amount. . . . When I discussed with Mr. Maguire the matter of reducing his indebtedness and he replied that he had no money, I never did call to his attention the fact that at times he had a large balance in the account. . . . I knew that he was in the general real estate business and I understood that he collected rents from various people and that all checks were deposited to his credit or that of 'the Agency and were made payable to that company and that he drew checks against the account as he saw fit. . . . I did not know that Maguire got a quarterly check from the Middleton Theatre Company which belonged to the Rutherfurd heirs.''

Other facts will be found in the opinion of the St. Louis Court of Appeals. Plaintiffs' position is that the relation between garnishee and the Agency was that of debtor and creditor and that this same relation existed between the Agency and interpleaders. Plaintiffs contend that garnishee did not have the right of set-off merely because the Agency note to it was not due at the time of garnishment. Plaintiffs and garnishee both rely upon Paul v. Draper, 158 Mo. 197, 59 S. W. 77; Security National Bank Savings & Trust Co. v. Moberly, 340 Mo. 95, 101 S. W. (2d) 33, and similar cases holding that a deposit of trust funds by a trustee creates a debtor and creditor relation between the bank and such trustee even though it knows that the deposit consists of trust funds. However, it does not follow merely because the deposit creates a debtor and creditor relation

that the bank always has a right of set-off against the depositor. While the bank obtains title to the deposit and becomes only the debtor of a trustee depositing trust funds so that, as against other creditors of the bank, such trustee is not entitled to preference in case of insolvency (which is all that Paul v. Draper holds); nevertheless, the bank is not the debtor to him personally but only owes him in his capacity as trustee. The trustee holds this claim against the bank in trust for the beneficiary. [American Law Institute Restatement of Trusts, sec. 12, comment h, p. 45.] If the bank has knowledge of the trust it has no right to set off the trustee's personal debt against the trust fund, and likewise the trustee has no general right to set off such trust fund against his own personal debt. [Buder v. Holt, 342 Mo. 666, 117 S. W. (2d) 235, and authorities cited; American Law Institute Restatement of Trusts, sec. 324, comment i, p. 969.]

In the Security National Bank Savings & Trust Company case, the basis of decision was not that there was no Agency or fiduciary relation (between the Trust Company and the mortgagees for whom it received and kept payments made by the mortgagor), but that "under the general law of agency an agent may assume either a contractual or fiduciary liability with respect to money paid him." This court there held that, while the Trust Company received the payments in a fiduciary capacity, it thereafter held these amounts, by the express terms of the written agreement between the parties, as a debtor of the mortgagees. This agreement made the situation the same as if, after a bank had made a collection as trustee, the mortgagee upon receipt of the funds then deposited them to his credit in the collecting bank. In other words, in the Security National case, the mortgagee agreed in advance for contractual (debtor and creditor relation) liability of his collecting agent after such collection had been made. The same thing may be said to be true of In re Citizens Bank of Senath (Mo. App.), 96 S. W. (2d) 526, also cited. Interpleaders, making claim under authority of Section 1404, Revised Statutes 1929, are seeking to recover the proceeds of the collection, of their quarterly lease payment made by the Agency, on the theory that its relation to them is that of trustee; that the trustee was not authorized to use their money but only to collect and remit it; and that this payment on their lease is a trust fund which can be traced to and found in the Agency's bank account with garnishee. Therefore, their pleadings converted the case into an equitable proceeding. [Reynolds v. Stepanek, 339 Mo. 804, 99 S. W. (2d) 65.] There was no agreement shown by which they agreed that their collecting agent could keep the proceeds collected for any length of time or use it for his own benefit in any way as in the Security National and Senath Bank cases. It can make no difference in their rights that the relation

344

between their trustee and the garnishee is that of debtor and creditor, unless upon grounds hereinafter discussed the garnishee had the right of set-off, or unless there be grounds for estoppel. Otherwise, however, if a trustee uses, invests or conceals trust money, *cestuis* can recover their fund if they can trace it into any existing loan, property, or fund due trustee or in his possession. [Lolordo v. Lacy, 337 Mo. 1097, 88 S. W. (2d) 353, and authorities there cited.]

Therefore, the decisive questions here are: Was there a trust relation between the Agency and interpleaders? If there was a trust relation, what knowledge did the bank have concerning it? As to the first question, it must be considered that the Agency was authorized by long course of dealing and the customary method of handling collections of rents to deposit the quarterly payments in its account with other collections and to remit to interpleaders by drafts (or by checks to residents) purchased with checks on this account. This authorization alone is not, however, sufficient to establish the relation of debtor and creditor. In the Restatement of Agency (sec. 398, comment b and c, pp. 901-902), it is said: "Unless so understood, an agent receiving money either as a trustee or a bailee is not privileged to change the right of the principal in the specific moneys received or his right against a bank if they are deposited into a debt claim against himself. The principal's trust is in the honesty and not necessarily in the solvency of the agent. . . . It may be understood that an agent is privileged to mingle the funds or fungible goods of various principals, as where a collecting agent has an account with a bank in which he keeps the funds of all of his clients, or a depository of grain mingles that of all the owners. In this case, the principals at any given moment are tenants in common of the claim against the bank or of the grain." In the Restatement of Trusts (sec. 179, comment e, pp. 459-460) it is said: "In the case of informal trusts where the trustee holds the funds of numerous beneficiaries, it may be proper to mingle the funds of all the beneficiaries. Thus, ordinarily, an attorney, a collecting agent or auctioneer can properly deposit in a single trust account the funds of all his clients provided he keeps a correct record of the contributions of the separate trusts. By the terms of the trust the trustee may be permitted to mingle trust property with his own property. . . . In the case of informal trusts such mingling is proper if such is the understanding of the parties as shown by their agreement or by custom. In such a case the trustee is not liable (for breach of trust) if he keeps on hand the amount of the trust property." When such deposit of client's funds is thus authorized, the agent or other informal trustee "is not liable for breach of trust (according to the Restatement) if the amount on deposit is not diminished by withdrawals or otherwise below the aggregate amount to which his cus-

tomers are entitled." This seems to be good law and good sense, and is in accord with the principles this court has followed in allowing preferences against failed banks in check collection cases. [Bank of Poplar Bluff v. Millspaugh, 313 Mo. 412, 281 S. W. 733, 47 A. L. R. 754; Federal Reserve Bank v. Millspaugh, 314 Mo. 1, 282 S. W. 706; Bank of Republic v. Republic State Bank, 328 Mo. 848, 42 S. W. (2d) 27; Commerce Trust Co. v. Farmers Exchange Bank, 332 Mo. 979 61 S. W. (2d) 928; Federal Reserve Bank v. Quigley (Mo. App.), 284 S. W. 164; Farmers Trust Co. v. Burnes Natl. Bank (Mo. App.), 285 S. W. 110; Gentry County Drainage Dist. v. Farmers & Mechanic's Bank (Mo. App.), 5 S. W. (2d) 1110; State Farmers Mutual Tornado Ins. Co. v. Cantley (Mo. App.), 6 S. W. (2d) 970; Farmers Bank v. Cantley (Mo. App.), 16 S. W. (2d) 642; Carson Natl. Bank v. American Natl. Bank, 225 Mo. App. 948, 34 S. W. (2d) 143.] In these cases, it was considered customary for the collecting bank to deposit the actual proceeds of the collection with one of its correspondent banks (or keep them itself) and send a draft on its account with a correspondent bank as remittance. Immediate remittance, after collection, is contemplated but the fact that a bank, acting under authority to collect and remit, does not send the actual cash (or actual checks or drafts taken in making collection) is not held to make it a debtor, instead of trustee, as to the forwarder of the collection items. In the Bank of Republic case, supra, this Court en Banc said that "the trust relationship sustained by the collecting bank to the forwarding bank grows out of the agential status of the former;" and that the forwarding bank "in accepting the draft from the (collecting bank) must be deemed to have done so only conditionally;" so that, in case of nonpayment its right is not lost to reclaim the proceeds of the collection by impressing a trust upon assets into which they can be traced.

In this case, there is no evidence that the Agency ever actually used any of interpleaders' money (or money of other clients) by drawing its bank account "below the aggregate amount to which (its) customers (were) entitled;" or, if so, that interpleaders knew or consented to use of their funds by that means or otherwise. Certainly that was not done in the instance under consideration. The proceeds of the Agency's collection for interpleaders went into its bank account on the day after garnishment and thereafter nothing went out. In our failed bank preference cases, we have perhaps gone beyond reasonable limits in presumptions that trust funds were still in existence in certain situations (see In re Mt. Vernon Bank, 334 Mo. 549, 66 S. W. (2d) 850]; but there is no problem of tracing trust funds here. Interpleaders' payment can be definitely traced to and held to be in existence in the Agency's account under the strictest rules of trusts. Surely if the Agency had been a bank,

and after making this collection for interpleaders had deposited the proceeds in its account with garnishee as its correspondent bank, there would be no question about their right to a preference over the Agency's general creditors upon the showing that nothing had thereafter been withdrawn from such account. Why then is not the relation between the Agency and interpleaders here that of trustee and *cestui*? Since there is no showing that any of interpleaders' money (except the Agency's commission for collecting it) was ever drawn out of the Agency's account for any purpose except to make remittance to them, and since nothing was withdrawn after the deposit in this instance, we hold that the Agency's relation to them was not debtor but trustee.

This brings us to the question of garnishee's knowledge of a trust relation. Garnishee's vice-president, who supervised the Agency's loan, knew from periodical examination of its account in connection with the note renewals that its average daily balance was very small; that during 1932 it had no money to make payments on its note; but that at times there would be a large balance in its account; that the Agency "collected rents from various people" for others and deposited all such checks in this account; and that it must have drawn checks thereon to make remittance of these funds. He may not have known that $4000 quarterly payments from the Middleton Theatre Company were deposited regularly for the purpose of remittance to interpleaders (and the trial court so found), although the bank records would have disclosed upon investigation that drafts were regularly purchased to do so. Certainly the frequent investigations of the Agency's account for the purpose of loan renewals, as well as efforts to make collection, must have disclosed much information about the Agency's business and the usual amount of its own funds in this account. Information concerning the source of this deposit made on the day after garnishment, and composed mostly of the $4000 check of the Theatre Company on its account with garnishee, was immediately available and this must have been disclosed by the investigation made. The fact that this deposit was made after garnishment was, at that time, called to the attention of the vice-president and it was investigated at once by the accounting department. The set-off charge "was put through February 1, 1933," and was for $4000 principal and $20 interest, which was the total amount then due on the Agency's note. Surely at that time garnishee knew of the source of these funds.

We think it is clear that garnishee did know that much of the Agency's account, at all times when there was a substantial balance, consisted of funds collected for others. With this knowledge, even though it did not know who such other persons were or how much was held for them, the weight of authority is that garnishee was not

entitled to set off its debt against such part of the funds as it could determine by reasonable investigation were held for collection and remittance to clients of the Agency. [See authorities cited by Court of Appeals, 101 S. W. (2d) l. c. 43-44; see also 9 C. J. S. 626, sec. 302; Steere v. Stockyards Natl. Bank (Tex.), 256 S. W. 586; Cable v. Iowa State Savings Bank (Iowa), 194 N. W. 957, 31 A. L. R. 748; Zollinger v. First Natl. Bank (Okla.), 259 Pac. 141; First Natl. Bank v. Duncan (Okla.), 260 Pac. 491; Allen Dudley & Co. v. First Natl. Bank (Neb.), 240 N. W. 522; notes 13 A. L. R. 324; 31 A. L. R. 756; 50 A. L. R. 632.] We, therefore hold that the Agency held $4000 of the deposit made after garnishment as trustee for interpleaders and that garnishee had no right to set off the Agency's own individual indebtedness against it. Plaintiffs of course, had no right to subject this credit to their claim because the Agency never obtained title to it and garnishee owed it to the Agency only in its capacity as trustee for interpleaders. [See note Ann. Cases 1917C, 1145.] Since it was not a debt due the Agency generally, it could not be reached by garnishment upon a judgment for its own individual debt, as against the claims of interpleaders.

We do not, however, agree with the Court of Appeals as to the effect of the garnishment upon the Agency's balance of $187.15 and Maguire's forty cents. Section 1399, Revised Statutes 1929, provides: "Notice of garnishment . . . shall have the effect of attaching all personal property, money, rights, credits (etc.) . . . in the garnishee's possession or charge or under his control at the time of service of the garnishment, or which may come into his possession . . . or be owing by him, between that time and the time of filing his answer." By such attachment, the garnishor obtains "a lien as against garnishees" which gives him "the right to hold the garnishees personally liable for its value." [Marx v. Hart, 166 Mo. 503, 66 S. W. 260.] The Agency's note held by garnishee provided that "as additional security for said above note . . . the Bank shall have a lien . . . upon the balance of any deposit account of the undersigned with the Bank at any time existing." It further provided that "if any writ of attachment, garnishment or execution shall be issued against the undersigned . . . the above note shall, at the option of the Bank, immediately mature and become forthwith due and payable, or the Bank without exercising such option of having such note matured, may off-set as against the liabilities of the undersigned to the Bank the liability, if any, of the Bank for any balance of bank deposit with the Bank to the credit of the undersigned and the Bank may apply such balance to the payment of the above note." Furthermore, the note was payable "On Demand, and if no demand be made on the 1st day of February, 1933."

It was early decided (under this same statute, see R. S. 1855, chap. 12, sec. 28) that "the rights of a garnishee will never be disturbed by the garnishment;" and that "whatever claim he may have against a defendant, and of which he might avail himself by set-off in an action between them, will be equally efficient when invoked by him on a proceeding by garnishment." [Firebaugh v. Stone, 36 Mo. 112.] This court in the Firebaugh case quoted with approval from Drake on Attachment, as follows: "An 'attaching creditor can hold the garnishee only to the extent of the defendant's claim against the garnishee, and he can acquire no rights against the latter, except such as the defendant had; and as he is not permitted to place the garnishee in any worse condition than he would occupy if sued by defendant, it follows necessarily, that whatever defense the garnishee could urge against an action by the defendant, for the debt in respect of which he is garnished, he may set up in bar of a judgment against him as garnishee.' " [See also Karnes v. Prichard, 36 Mo. 135; McPherson v. A. & P. Railroad Co., 66 Mo. 103; Johnson v. Geneva Pub. Co., 122 Mo. 102, 26 S. W. 676; People's Savings Bank v. Hoppe, 132 Mo. App. 449, 111 S. W. 1190; Bank of High Hill v. Rockey (Mo. App.), 277 S. W. 575; Brandom v. Power, (Mo. App.), 41 S. W. (2d) 879; Roberts v. Meek (Mo. App.), 45 S. W. (2d) 537; Raithel v. Hamilton-Schmidt Surgical Co. (Mo. App.), 48 S. W. (2d) 79; South Central Securities Co. v. Vernon, 227 Mo. App. 486, 54 S. W. (2d) 416; State ex rel. Adkins v. Grugett, 228 Mo. App. 8, 63 S. W. (2d) 413; 12 R. C. L. 830, sec. 68; 28 C. J. 278-281, secs. 395-400; 9 C. J. S. 636, sec. 309; see also secs. 296-298; Rood on Garnishment, 476, sec. 378; 2 Shinn on Attachment & Garnishment, 1027, sec. 624.] We fully agree with Iler v. Midland Natl. Bank, 69 Mo. App. 64, that in the absence of an agreement a debt due cannot be set-off against an unmatured debt. However, we see no good reason why the maker of a note to a bank cannot by written contract give the bank a lien on his deposit account (technically it might better be said that the maker's right to his deposit account is made collateral security for his note); or why such a lien could not be enforced by set-off of such deposit at any time against a note such as this one which at least at garnishee's option became payable upon demand; or why, if a depositor's right to his deposit is made collateral security for his debt, garnishment should affect the bank's right to make the set-off before determining the amount due from it to the garnishment defendant. Such a lien was held valid by the United States Circuit Court of Appeals, Seventh Circuit, in Wright v. Seaboard Steel & Manganese Corp., 272 Fed. 807.

Certainly, if a valid contract for such collateral security is made as part of the consideration for a loan or its renewal, the maker of the note could not sue the bank and recover his deposit (or damages)

if the bank refused at any time to let him draw it out. This court so held in the case of a verbal agreement in Roe v. Bank of Versailles, 167 Mo. 406, 67 S. W. 303. Why then should this creditor have any better right than his debtor? (We recognize, however, that grounds for estoppel could exist.) If the garnishee had possession of personal property pledged by the defendant as security for an unmatured debt, certainly garnishment thereof would be effective only as to any excess value remaining after applying it to the payment of the debt it was pledged to secure. [2 Shinn on Attachment & Garnishment 975, sec. 585; 28 C. J. 255, sec. 353.] We think that (in the absence of circumstances showing a fraudulent purpose or creating an estoppel) the same rule should apply to a bank deposit balance which was by express agreement of the parties prior to garnishment made security for the depositor's note to the bank. We believe that, as applied to the terms of our garnishment statutes, reason and the weight of authority is against the holding to the contrary in the New York case (Samuels v. Public Natl. Bank & Trust Co., 251 N. Y. Supp. 671) followed by the Court of Appeals. We note that the Supreme Court of Pennsylvania recently overruled decisions of the Superior Court of that State denying a bank's right to set-off deposits against notes containing provisions similar to those shown in this case. [See Adolph Bergman Building & Loan Assn. v. Blaul, 178 Atl. 140, reversing the same case in 175 Atl. 743, which had followed the rule stated in Valiant Company v. Pleasanton, 164 Atl. 143, overruled by Aarons v. Public Service Building & Loan Assn., 178 Atl. 141; see, also, Joseph Melnick Building & Loan Assn. v. Melnick, 178 Atl. 144; see, also, Walters v. Bank of America Natl. Trust & Savings Assn. (Cal.), 59 Pac. (2d) 983; United States v. Bank of Shelby (U. S. C. C. A.), 68 Fed. (2d) 538; Macon Natl. Bank v. Smith (Ga.), 153 S. E. 4.] In the Bergman Building & Loan case, supra, the court said: "There is nothing in the record to raise estoppel, nothing to show any reason why the bank should have pursued its borrower prior to the attachment, or of which the attaching creditor can be heard to complain. There is nothing in the record that would require the bank to close the checking account by crediting the amount on the notes before the attachment was served. As they were demand notes, and therefore due and payable, it is, for the purposes of this case, immaterial, as between the bank and the depositor, whether the notes gave the bank a lien or not." In the Aarons case, supra, the court held, also in the case of a demand note, that appropriation of the deposit, by book entries prior to garnishment, was not necessary to the right of set-off thereafter because "if cross-demands are pleaded and proved they extinguish each other." We hold that the same thing is true in this case; that garnishee here, by reason of express written agreement with its debtor, had at the time of garnishment the right of

350

set-off as to the balance in the Agency's account; and that there was no remaining debt of the bank to the Agency or Maguire subject to plaintiffs' garnishment.

The judgment is reversed and the cause remanded with directions to enter a decree awarding $4000 of the Agency's deposit to interpleaders; affirming garnishee's right to apply the balance thereof to the Agency's note; and making such orders, concerning the collateral notes and other property of the Agency or Maquire in the possession of garnishee, as may be necessary and in accord with the rulings herein made. The question of allowance of interest to interpleaders is also left for determination of the trial court. *Ferguson* and *Bradley, CC.,* concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur, except *Lucas, J.,* not sitting.