MARY H. GORMAN and CATHERINE E. GORMAN, Appellants, v. MERCANTILE-COMMERCE BANK & TRUST COMPANY, a Corporation, Trustee Under the Will of GOTTLIEB J. STOCKER, also known as GEORGE J. STOCKER, MERCANTILE-COMMERCE BANK & TRUST COMPANY, a Corporation, ANTHONY CANZONERI, JOSEPH RIGGIO and IGNAZIO RIGGIO.—137 S. W. (2d) 571.

Division One, March 6, 1940.

1060

*Cullen, Storckman & Coil, Frank L. Ramacciotti* and *Hyman G. Stein* for appellants.

*Thompson, Mitchell, Thompson & Young, Samuel A. Mitchell, Richmond C. Coburn, Robert Neill, Jr.,* and *Richard D. Shewmaker* for respondents.

1062

HYDE, C.—This is an action for specific performance of an alleged contract to convey real estate. The trial court found in favor of defendant Trust Company, and also in favor of the individual defendants (claiming title as bona fide purchasers) on their cross-bill affirmatively seeking adjudication of the title. Plaintiffs have appealed from the court's decree dismissing their bill.

Plaintiffs' second amended petition, upon which the case was tried, alleged that Gottlieb (George) J. Stocker, at the time of his death was the owner of the real estate described in said petition; that the Trust Company was his executor; and that his will appointe' the Trust Company trustee with the right and duty to sell this la‍r .. The petition further alleged that on July 26, 1934, the defen‍d‍ ‍it Trust Company, as such trustee, by an agreement in writing,‍ ‍ ‍ld said real estate to the plaintiffs for $9750; that thereafter the‍ ‍ ‍1 ‍st Company refused to carry out the agreement and informed‍ he plaintiffs that it would not convey said property to them; tha‍t‍ ‍he agreement was recorded in the office of the Recorder of Dee‍'‍ ‍on August 2, 1934; that thereafter the Trust Company conveyed the property to defendant Canzoneri; and that said Canzoneri had st‍. ‍icken out his own name in the deed and inserted the names of defendants Joseph Riggio and Ignazio Riggio. The petition further alleged that Canzoneri and the Riggios had either actual or constructive notice of the existence of plaintiffs' agreement, and that they acquired no right, title or interest in the real estate against plaintiffs by reason of said purported deed. The prayer was for specific performance by the trustee of the agreement and a decree that the other defendants had no interest in said real estate, and for general relief.

The Trust Company's answer denied that a binding contract of sale to plaintiffs was executed, denied that it was entitled to record, set up alteration of the contract by plaintiffs, and Statute of Frauds, and stated that it had sold and conveyed the property to defendant Canzoneri, who acted for defendants Riggio, the real purchasers;. that these defendants had no knowledge of plaintiffs' claim; and that fee simple title should be vested in them. The answer and cross-bill of the individual defendants was substantially the same as the answer filed on behalf of the Trust Company, except that it contained a cross-bill wherein it was alleged that the defendants Riggio had made extensive improvements to the property and had enhanced its value to $25,000. The prayer of this cross-bill asked that specific performance be not declared, except on condition of reimbursement of defendants for their improvements, but asked that the defendants Joseph Riggio and Ignazio Riggio be adjudged the owners in fee simple of said real estate.

The decree of the court found that title to the real estate in issue was vested in the Mercantile-Commerce Bank & Trust Company as trustee under the will of George J. Stocker, deceased; that plaintiffs, by the instrument of July 26, 1934, offered to purchase this real estate; that this instrument did not become a valid and binding contract for the reason that R. E. Matthews, signing for the Trust Company, was not expressly authorized to bind the Company as such trustee in the sale of this real estate; and that the plaintiffs and their duly authorized agent, John K. Gorman, showed by their course of conduct before and after the signing of this instrument that they did not believe or rely upon the fact that Matthews had any apparent authority to bind the Trust Company. The decree further found that the Trust Company had, by its authorized officers, accepted the offer of defendant Canzoneri for said property and conveyed the same to him; that John K. Gorman learning there was another bidder on August 2, 1934, had attached his name as a subscribing witness, without the knowledge or consent of the Trust Company, for the purpose of proving execution by its agent; that on the same date the plaintiff Mary H. Gorman had attached her acknowledgment, but did not attach the acknowledgment by herself as agent of Catherine E. Gorman; that this was done for the purpose of admitting the instrument to record, but was not done contemporaneously with the signing of the instrument; and that the individual defendants did not have any actual knowledge of the claims asserted by the plaintiffs. The court further found that the deed from the Trust Company was delivered with the name of Anthony Canzoneri as grantee, but that it was intended that the defendants Joseph Riggio and Ignazio Riggio should be the owners; that Canzoneri erased his name as grantee and substituted the names of Joseph Riggio and Ignazio Riggio, but that this act in no wise affected the title and that the legal title thereto at all times since the conveyance had been vested in Canzoneri, and that the equitable title was vested in defendants Joseph Riggio and Ignazio Riggio. The court then decreed that plaintiffs' petition be dismissed and that legal title be divested from defendant Canzoneri and vested in the defendants Joseph Riggio and Ignazio Riggio, and adjudged costs against plaintiffs.

Plaintiffs had assignments of error as to the finding in the decree that the individual defendants had no actual knowledge of plaintiffs' claims and as to the part thereof granting affirmative relief to such defendants and decreeing title in them. However, these assignments are not mentioned in plaintiffs' points and authorities or argument. Plaintiffs' points only concern their right to enforce the agreement against the Trust Company. (Contentions are that it was bound because of apparent authority of its agents who dealt with plaintiffs; that its defense of alteration was not good because alterations were immaterial; that its defense of Statute of Frauds

1064

was inapplicable; and that its failure to verify its answer prevented it from denying execution of the contract alleged.) Therefore, plaintiffs have abandoned their assignments against the part of the decree in favor of the individual defendants which vested title in them on their cross-bill seeking affirmative relief. [Scott v. Mo. Pac. Ry. Co., 333 Mo. 374, 62 S. W. (2d) 834; Clay v. Owen, 338 Mo. 1061, 93 S. W. (2d) 914; Majors v. Malone, 339 Mo. 1118, 100 S. W. (2d) 300; Supreme Court Rule 15; Sec. 1061, R. S. 1929, 2 Mo. Stat. Ann. 1346.] Furthermore, it is clear that there is ample evidence to support the Chancellor's finding that the individual defendants acted in good faith without actual knowledge of plaintiffs' claim; and that plaintiffs were only able to place their contract on record (on the day before the deed to the individual defendants was recorded and the same day it was made) by obtaining a certificate of proof by subscribing witness which was not true in fact. [See Carson v. Woods (Mo.), 177 S. W. 623.] Since this part of the decree stands, there can be no order of specific performance made against the Trust Company because it could have no title to convey. [25 R. C. L. 245, sec. 48; 58 C. J. 999, sec. 42; 58 C. J. 923, sec. 87; Lennox v. Texas Farm Bureau Cotton Assn. (Tex.), 16 S. W. (2d) 413; Lennox v. Texas Cotton Co-Op. Assn., 55 S. W. (2d) 543; Carson v. Woods (Mo.), 177 S. W. 623.] However, the situation might be such as to justify a judgment against the Trust Company for damages which would require that the cause be remanded for that purpose. [Rockhill Tennis Club v. Volker, 331 Mo. 947, 56 S. W. (2d) 9.] This would depend upon a sufficient showing to warrant a finding of equities in plaintiffs' favor.

Here, we are faced with the findings of the trial Chancellor against plaintiff's namely: That plaintiffs did not have a valid and binding contract, because the agent of the Trust Company with whom they dealt did not have authority to make such a contract; that plaintiffs' course of conduct showed that they did not believe that this agent had such authority; and that they did not rely upon the fact that he had any apparent authority to bind the Trust Company. Of course, in equity cases, we are not bound by the Chancellor's findings on appeal but consider the evidence in the record *de novo*. Nevertheless, where such findings are based on conflicting oral testimony of witnesses before the Chancellor, we usually defer to them unless convinced the weight of the evidence is so overwhelmingly against them that they are clearly erroneous. We will, therefore, review the evidence before the trial court on these issues.

The negotiations for the sale of the property were handled mainly by plaintiff's brother John Gorman, for plaintiffs, and R. L. Klein, salesman in its Real Estate Department, for the Trust Company. According to Gorman, he went to the Trust Company to inquire about the property because there was a sign on the property show-

ing the Trust Company had it for sale. He said he went to the Trust Company and asked the doorman whom to see about it and was referred to Mr. Klein in the Real Estate Department. According to Klein, David Weinberg, a real estate broker, told him that the Gorman people lived next door to the Stocker property and informed him that they were prospects for a sale. Klein said that he went to their home and saw plaintiffs' father who said his son would "go down there and see you." When John Gorman came he made an offer of $7500. Klein told him that he would have to take it up with Mr. Monahan of the Trust Department. Mr. Monahan refused to consider this offer and, after negotiations by telephone, Gorman increased plaintiffs' offer to $8250. Klein drew up a contract on the basis of that offer and took it out to plaintiffs' home where it was signed by Catherine E. Gorman for plaintiffs on Monday, July 23, 1934. The first paragraph of this contract, omitting description of the property, was as follows:

"Received of Mary H. Gorman, and Catherine E. Gorman, the sum of Two Hundred and fifty and no/100 Dollars ($250.00) as earnest money and as part of the purchase money for a certain parcel of improved property, situated in the City of St. Louis. . . . (Description.) . . . Which property is this day sold to Mary H. Gorman and Catherine E. Gorman, for the sum of Eight thousand two hundred fifty and no/100 Dollars ($8,250.00), payable as follows, to-wit: Eight thousand two hundred fifty and no/100 Dollars ($8,250.00) in cash (less the amount above receipted for)."

The contract also ended with the following provisions and signatures:

"The sale under above contract shall be closed on or before Aug. 2, 1934, or as soon thereafter as title can be perfected to date, at the office of the Mercantile-Commerce Bank and Trust Company.

"This Contract of Sale is made subject to the approval of the owner of said property, and when so approved is binding upon both parties hereto.

"In Witness Whereof, The parties hereto have signed the above in duplicate the day and year first above written.

"George J. Stocker Estate.
"Mercantile-Commerce Bank & Trust Co., Agent.
"by R. L. Klein.
"I agree to above Terms and Conditions:
"Catherine E. Gorman,
"Mary H. Gorman,
"by Catherine E. Gorman.
"St. Louis, Mo., . . . . . . . . . . . ,19 . . . . . . . . . . . . . . . .

"I hereby approve the above Contract of Sale and agree to pay Mercantile-Commerce Bank and Trust Company the regular Real

Estate Exchange rate of Commission, as commission for their ser-
vices in effecting this sale.''

—————————————(No signature.)

Klein said that he submitted this contract to the Trust Depart-
ment and that Mr. Monahan refused it. He also said that Mr. Mona-
han refused another contract for $8500 from another prospective pur-
chaser on the same day. Klein went back to plaintiffs' home and
returned the $250 check and was given the contract by John Gorman.
Gorman said: ''He wanted the contract back. I got peeved and told
him what a rotten deal they made. He said they wanted the con-
tract back because they wanted to raise the figure, and I said we
were through with them.'' Gorman further testified: ''That even-
ing, Mr. Klein said they were ready to close the deal for $10,000.00.
I told him I would be willing to pay $9,750.00. He said he would
call me the next morning. The next morning he called and said it
was o. k. for $9,750.00.'' On Thursday, July 26th John Gorman
and Mary Gorman went to the Trust Company where Mary Gorman
signed another contract with the same provisions as the contract
of July 23rd except that $500 was paid as earnest money and the
total consideration was stated as $9750. It was signed by Mr. Mat-
thews, cashier of the Real Estate Department, instead of by Mr.
Klein, and provided for commission to Weinberg instead of to the
Trust Company. Klein testified: ''The custom is when a contract
is drawn up that contract must be sent over to the Trust Department
or to Mr. Monahan, who handles the real estate for that department.
Mr. Monahan submits the offer to the next trust committee meeting
(on Thursday of each week) for their approval or rejection. . . .
I told them that it was too late, that the meeting had already ad-
journed, and they would have to wait until next Thursday before it
could be acted on; but I told her that I thought her contract was o. k.''

John Gorman's testimony about this was: ''He said: 'I will take it
over to Mr. Monahan and get your deed and title.' He went around
to the side and he come back in a few minutes; he said he wouldn't
be able to deliver it today; that we would have to wait until next
week. . . . I asked him about Weinberg & Weinberg being men-
tioned in the contract. . . . He said that was only for their com-
mission (to be paid by the Trust Company) for the sale of the
property, but he told me not to worry about it.'' Mary Gorman also
testified: ''He (Klein) said that the contract had to go before the
board and that was to get the title and the deed and that was the pur-
pose of my coming in there that Thursday morning. . . . The
meeting had adjourned after I got finished signing it and he got
around there, and he said that it would have to go over until the fol-
lowing Thursday. . . . My brother spoke up and said, 'How
do we know you are going to do the same thing you did before?'
And he said, 'You have no fear; Mr. Monahan has approved it this

time; he's a trust officer and also head of the Real Estate Department.' "

Mr. Matthews testified that his signature was to receipt for earnest money paid, and that such a contract was an offer to be submitted to the Trust Committee. Mr. Monahan said that he refused plaintiffs' $8250 offer without submitting it; and that he did not submit their $9750 offer because, on Saturday, July 28th, defendant Canzoneri made an offer of $11,000. Thereafter, Klein went to plaintiffs' home to return the earnest money check and get the second contract. Plaintiffs refused to give it to him and would not accept the check. However, on Monday, July 30th, John Gorman came back to the bank to see Judge Hennings who was the head of the Trust Department. He was accompanied by Mr. Stocke, a friend of his who knew Judge Hennings. Judge Hennings testified as follows concerning their conversation:

"Mr. Stocke and Mr. Gorman came in and Mr. Stocke said that he felt they had not been treated fairly in this matter; that he felt that they should be given more consideration. I told them they had made an offer for the property; that the offer for the property had not been submitted to the trust committee; but in the meantime a better offer had been received, and I instructed our Real Estate Department to return the earnest money which had been advanced by the Gormans and return the contract. . . . I told them, in any event, it would be necessary for us to get the best price for the trust committee to approve it. Well, Mr. Stocke said then he would consider twelve thousand dollars for the property and I said, 'Well, I will submit that for the trust committee,' and then he and Mr. Gorman conferred and, it is my recollection, told me they were willing to pay twelve thousand dollars for the property. I said, 'Well, there may be other offers and the best offer that we have prior to the meeting of the trust committee on the following Thursday would be submitted with the recommendation that the best offer be accepted.' "

Following this conversation plaintiffs wrote the following letter to the Trust Company:

"St. Louis, Missouri, July 30, 1934. Judge Thomas Hennings, Mercantile-Commerce Bank and Trust Company, St. Louis, Missouri. Dear Judge Hennings: This will confirm the verbal offer of $12,000.00 (Twelve Thousand Dollars) made to you by Mr. Stocke and my brother while in your office this morning, covering property at Kingshighway and Odell Avenues, described in detail as follows: (description). . . . In view of the fact that we have priority in the matter we shall expect to hear from you with a favorable reply. Yours very truly, Mary H. Gorman, 2823 South Kingshighway, Catherine E. Gorman, per M." 

However, Canzoneri increased his offer to $12,500.00 on August 1st and a contract in the same form as those signed by plaintiffs was

signed by him on that date. There is no evidence that he knew who the other bidders were. On the next day, Thursday, August 2nd, the trust committee of the Trust Company approved the sale to Canzoneri for $12,500 and a deed was executed conveying the property to him, which was recorded on August 3rd. However, on the afternoon of August 2nd, John Gorman employed an attorney who went with him to the Federal Reserve Bank, where Mary Gorman was employed, and had her acknowledgment to the contract of July 26th taken before a notary public and written on the back of the contract. They then went to the Recorder's office to put the contract on record, but the Recorder would not accept it because there was no acknowledgment by anyone on the part of the Trust Company. To get it on record, John Gorman signed as a witness to the signature of Matthews and went before another notary public who placed on the back of the contract a certificate of proof of Matthews' signature by John Gorman as subscribing witness. After this was done, the contract was accepted by the Recorder and recorded.

█ It is obvious that there was ample evidence to warrant the findings made in the trial court's decree. The Chancellor was in a better position to pass upon the accuracy and credibility of the witnesses, who appeared before him, than we are. It is apparent that he accepted the testimony of the officers and employees of the Trust Company as to what was said and done during the negotiations. Plaintiffs' testimony (although it makes a different construction of them) is not in direct conflict as to most of the material facts stated by these witnesses. Moreover, plaintiffs' actions directly corroborate this testimony and the court's finding that they did not believe the agents, with whom they dealt, had authority to make a binding contract of sale without the acceptance thereof by the Trust Committee. Plaintiffs' first contract, which was voluntarily surrendered, was no different (except in amount of purchase price) than the one they sought to enforce. Each contract had a place provided for another signature to show approval by the vendor, which was shown as the Stocker estate and not the Trust Company. Furthermore, it is significant that before plaintiffs made any attempt to enforce this contract, they made a higher offer, by letter, than the price stated in it. Thus they treated their former so-called contracts as offers.

█ Plaintiffs knew that the real estate was the property of the Stocker estate, so, of course, they knew that the Trust Company was dealing with it in a representative capacity. Estate or trust property frequently requires even court approval for its sale and most people know that. It is not unreasonable to believe that plaintiffs knew their contract required approval from some source other than the individual employees with whom they dealt. We think a reasonable construction of the provision of this contract (requiring approval of the owner), is that it was intended to mean approval by

the trust committee or Trust Department of the Trust Company. It is, of course, well known that even an individual may have a dual capacity (when he is an agent or trustee), and acts differently in his representative capacity than he does for himself with his own property. This court has recognized the difference in capacities between the commercial banking department of a trust company and its obligations as a trustee. [See Security National Bank Savings & Trust Co. v. Moberly, 340 Mo. 95, 101 S. W. (2d) 33; see also Brown v. Maguire's Real Estate Agency, 343 Mo. 336, 121 S. W. (2d) 754.] It seems reasonable to do so as between its real estate sales department and its duties as executor or testamentary trustee under the evidence in this record. Our conclusion is that the Chancellor's findings should be accepted as correct and plaintiffs' so-called contracts construed as unaccepted offers. [See Southern Real Estate & Finance Co. v. Park Drug Co., 344 Mo. 397, 126 S. W. (2d) 1169.] It is, therefore, unnecessary to consider other questions raised.

The decree is affirmed. *Bradley* and *Dalton, CC.,* concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur.