267 So.2d 26 (1972)
GRANDIN INDUSTRIES, INC., Appellant,
v.
FLORIDA NATIONAL BANK AT ORLANDO, Appellee.
No. 71-778.
District Court of Appeal of Florida, Fourth District.
September 12, 1972.
*27 William C. Frye of Trenam, Simmons, Kemker, Scharf & Barkin, Tampa, for appellant.
Monroe E. McDonald of Sanders, McEwan, Mims & McDonald, Orlando, for appellee.
REED, Chief Judge.
The issue here is whether or not the Circuit Court for Orange County, Florida, erred in entering a summary final judgment for the defendant.
The plaintiff in this case, Grandin Industries, Inc., an Ohio corporation, filed a complaint on 6 July 1970. The complaint is in two counts. In the first count, Grandin Industries, Inc., attempted to state a cause of action in its capacity as an assignee of CMC, Inc., a Florida corporation, formerly known as Citrus Machinery Company, Inc. The second count which is based on the same factual averments as the first is brought by the plaintiff as the sole shareholder of the capital stock of CMC, Inc.
The defendant, the Florida National Bank at Orlando, denied all essential allegations of the complaint and set up various defenses which are not material to the appellate issue. On 10 August 1971 the trial court granted defendant's motion for summary judgment and entered a final judgment for defendant from which the plaintiff has taken this appeal.
The essential facts are taken from the complaint and appellant's brief. The complaint alleged that on 26 October 1967 the defendant loaned CMC, Inc., $75,000.00. The loan was thereafter increased to $125,000.00. The loan was secured by a real property mortgage. On 8 February 1968 CMC, Inc., and the defendant agreed that the amount of the mortgage loan was $125,100.00 and would be repaid at the rate of $2,000.00 per month. Thereafter CMC, Inc., and the defendant entered into a Security Agreement which contemplated account receivable financing. The pertinent paragraphs in the agreement are as follows:
"2. Bank will from time to time hereafter lend Borrower, on the security of *28 accounts and contract rights, or either of them, acceptable to Bank, such amounts as Bank may determine from time to time, at such rates of interest and payable on such terms as Bank may from time to time specify or require, and Bank may require that such loans, or any of them, be evidenced by promissory note or notes of the Borrower in form satisfactory to Bank... .
"3. As security for the payment of all loans and advances now or in the future made hereunder and for all Borrower's liabilities, including any extensions, renewals, or changes in form of any thereof: (a) if the office where Borrower keeps its records concerning its accounts and contract rights is in this or any other state in which the Uniform Commercial Code is in effect, Borrower hereby assigns to Bank and grants to Bank a security interest in: (i) all accounts owned by Borrower at the date of this agreement; (ii) all accounts at any time hereafter acquired by Borrower. ...
"4. So long as any liability to Bank is outstanding, Borrower will not without the prior written consent of Bank ... permit any lien or encumbrance to attach to any of the foregoing, or any levy to be made thereon. ...
* * * * * *
"7. Unless Bank notifies Borrower in writing that it dispenses with any one or more of the following requirements, Borrower will: ... (f) receive as the sole property of Bank and hold as trustee for Bank all moneys, checks, notes, drafts, and other property therein called `items of payment' representing the proceeds of any account contract right or inventory in which Bank has a security interest, which come into the possession of Borrower; and deposit all such items of payment immediately in the exact form received in a special account of Borrower in Bank entitled `Cash Collateral Account' in which account Bank shall have a security interest to secure all Borrower's liabilities and with respect to which account Bank alone shall have power of withdrawal. .. ."
* * * * * *
"11. Bank shall have the right at any time and from time to time, without notice to: (a) apply any part or all of the moneys in the Cash Collateral Account representing collected items against any liability of borrower to Bank ... (e) notify Purchasers that accounts or contract rights have been assigned to Bank, forward invoices to Purchasers, directing them to make payments to Bank, collect all accounts in its or Borrower's name, and take control of any cash or non-cash proceeds of accounts and of any returned or repossessed goods; (f) compromise, extend or renew any account or deal with the same as it may deem advisable. ...
"12. If at any time any warranty, representation, certificate or statement of Borrower is not true, or if any liability or any part or installment thereof or interest thereon is not paid when due or if any event of default as defined in any note or other evidence of liability held by Bank should occur, or if Borrower should fail to observe or perform any agreement or term thereof, or if Bank at any time feels insecure for any reason whatsoever, Bank may, at its option, thereupon or thereafter declare all liabilities of Borrower to Bank ... immediately due and payable without demand or notice of any kind....
* * * * * *
"16. This agreement may be terminated by either party giving the other written notice of intention to terminate on a date named in said notice, mailed to the last known address of the party to whom such notice is addressed; but no such termination shall in any way affect the rights and liabilities of the parties hereunder relating to loans or advances made, accounts, contract rights, or other *29 property pledged prior to the date named in such notice." (Emphasis added.)
* * * * * *
In July 1968 CMC, Inc., was indebted to the United States for back taxes in the approximate amount of $43,000.00. On 3 July 1968 the Internal Revenue Service filed a notice of levy and served a copy on the defendant Bank. The notice of levy indicates an indebtedness for taxes in the total amount of $43,905.32. It is addressed to Florida National Bank at Orlando and states:
"You are further notified that demand has been made for the amount set forth herein upon the taxpayer who has neglected or refused to pay, and that such amount is still due, owing and unpaid from this taxpayer. Accordingly, you are further notified that all property, rights to property, moneys, credits, and bank deposits now in your possession and belonging to this taxpayer (or with respect to which you are obligated) and all sums of money or other obligations owing from you to this taxpayer, or on which there is a lien provided under Chapter 64, Internal Revenue Code of 1954, are hereby levied upon and seized for satisfaction of the aforesaid tax, together with all additions provided by law, and demand is hereby made upon you for the amount necessary to satisfy the liability set forth herein, or for such lesser sum as you may be indebted to him, to be applied as a payment on his tax liability... ."
The notice of levy inspired a meeting on July 5, 1968, between the president of the defendant bank, O.P. Hewitt, IRS agent Kennedy, and David Crawford, the prime functionary of CMC, Inc. With respect to this meeting, the brief of the appellant says:
"... Payroll checks of CMC were outstanding, and David Crawford, an officer of CMC, met at the Bank with the IRS agent, Kennedy, and the Bank's president, O.P. Hewitt, Jr., on July 5th ... At this meeting, Crawford had an invoice for approximately $46,000.00 representing an account receivable of Reynolds Metal Company, a customer of CMC, and it was agreed that the Bank would loan against or discount the invoice and the IRS would remove the notice of levy in return for $10,000.00 which was to come out of the Reynolds Metal Company invoice ... The invoice was given to the Bank by Crawford ... When Crawford returned to the Bank on Monday July 8, to pick up the $10,000.00 check for the IRS, he was advised by the Bank's president, Mr. Hewitt, that the Bank was not going to give Crawford the $10,000.00 check for the IRS... ."
* * * * * *
"... The Bank, having agreed to discount the $46,000.00 Reynolds Metal Company invoice out of which the $10,000.00 was to come, had possession of the invoice. It was at this point that the Bank announced that it was not going to discount the Reynolds invoice and when Crawford asked for it back in order to collect the invoice directly from Reynolds Metal Company ... he was told that the Bank would not return it and was going to apply the invoice collection to the mortgage debt... ."
Paragraph 10 of the appellant's complaint states that the bank collected the proceeds from the invoice and applied the same to the "working capital loan and the mortgage loan, notwithstanding the then current status of such loans."
Appellant states its first point as follows:
"The circuit court erred in rendering final summary judgment in favor of the Bank on Count I of the complaint in that genuine issues of material fact existed."
The appellant's brief states as follows the legal theories embodied in Count I *30 of its complaint under which it sought relief in the trial court:
"In Count I of the complaint, as amended, Grandin sued the Bank for damages arising out of the Bank's refusal to loan money against or return an invoice given it under the accounts receivable financing agreement of February 19, 1968 ... Grandin contended that the Bank's conduct constituted a breach of the loan agreement and that the Bank improperly terminated the agreement without notice. Grandin further contended that the Bank wrongfully applied the invoice or its proceeds to the reduction of a then current loan which was adequately secured by a real property mortgage... ."
* * * * * *
"The Bank's liability in the first instance depends upon whether it breached the accounts receivable financing agreement after having acquired possession of the Reynolds Metal Company invoice... ."
These theories advanced by the appellant in support of its claimed right to damages, when considered against what actually happened  as indicated by the complaint and appellant's statement of facts  are demonstrably without merit. First of all the appellant predicates a right of recovery on the refusal of the bank to lend money against the Reynolds Metal invoice. This contention is answered fully by paragraph 2 of the Security Agreement, supra. Whether or not the bank loans money is solely a matter within the bank's prerogative. Hence the refusal of the bank to loan money was not a breach of contractual obligation.
Secondly, the appellant argues that the bank wrongfully collected the proceeds from the Reynolds Metal invoice and applied the same against, "... a then current loan which was adequately secured by a real property mortgage." Appellant's argument begs the question by assuming without demonstrating that the bank had no right to collect the account represented by the invoice. This of course is the important question of law. Paragraph 3 of the Security Agreement assigned to the bank not only the accounts of CMC, Inc., in existence at the time of the execution of Security Agreement, but also after-acquired accounts. The UCC § 679.204(3) F.S. 1971, F.S.A., confirms the validity of a pledge of after-acquired accounts. Paragraph 11 of the security agreement provides:
"11. Bank shall have the right at any time and from time to time, without notice to: (a) apply any part or all of the moneys in the Cash Collateral Account representing collected items against any liability of borrower to Bank ... (e) notify Purchasers that accounts or contract rights have been assigned to Bank, forward invoices to Purchasers, directing them to make payments to Bank, collect all accounts in its or Borrower's name, and take control of any cash or non-cash proceeds of accounts and of any returned or repossessed goods; (f) compromise, extend or renew any account or deal with the same as it may deem advisable... ."
We can only conclude that the foregoing provisions empowered the bank to collect the account represented by the invoice and, either directly or through the Cash Collateral Account, apply same to any indebtedness from borrower to bank  regardless of due date.
The plaintiff's third theory of liability is that the bank without notice terminated the financing agreement. The undisputed facts indicate, however, the bank terminated the arrangement only to the extent that it refused to lend further monies to CMC, Inc. This cannot be the subject of a damage action for the simple reason that there was no contractual obligation on the bank to continue lending money to CMC, Inc.
It, therefore, appears that all three theories of liability posed under Plaintiff's *31 Count I are shown by the admitted facts and the applicable law to be without merit. They are simply inconsistent with the contractual arrangement between the bank and CMC, Inc.; hence, the summary judgment was correct as to Count I.
Appellant states its second point as follows:
"The circuit court erred in rendering final summary judgment in favor of the bank on Count II of the complaint in that genuine issues of material fact existed."
Count II of the complaint is based on the same factual averments as Count I, except that the plaintiff Grandin Industries, Inc., (the Ohio corporation) alleges in Count II that it was the sole shareholder of the capital stock of CMC, Inc., which is a direct result of the defendant's conduct was rendered valueless.
These allegations do not state a cause of action for the simple reason that a stockholder has no right to sue for damages to the corporation, unless the suit is a derivative action. The appellant's brief admits the correctness of this proposition as a matter of law and admits this is not a derivative suit. At page 19 of its brief the appellant says in describing the action of the trial court:
"... The Court then apparently applied the rule that a shareholder cannot sue except in a derivative action for a wrong done to the corporation, and entered judgment against Grandin... ."
"This appeal does not challenge that rule. The Circuit Court, however, misconceived the posture of Grandin, which sued to enforce a right existing in it, as distinct from the corporation... ." (Emphasis added.)
The appellant's brief goes on to say:
"In the instant case, Grandin and the Bank were parties to the escrow agreement. The Bank, like all parties to a contract, impliedly agreed not to take any action which would hinder or prevent Grandin from performing its obligations in connection with the escrow agreement... .
"The escrow agreement, or course, contemplated the timely payment by Grandin for the stock. The Bank's conduct in regard to the Reynolds Metal Company invoice and loan agreement had the direct and obvious consequence of rendering it impossible for Grandin to continue to make payments to Smith under the stock sale agreement... ." (Emphasis added.)
The reference here is to an escrow agreement which is found in the appellant's appendix. A reference to the escrow agreement shows that "Grandin", the plaintiff in this action, is not the Grandin who is the party to the escrow agreement. The escrow agreement is between Grandin Industries of Florida, Inc., and one S.A. Smith with the defendant bank as the escrow holder. Basically the escrow agreement involves the method by which Grandin Industries of Florida, Inc., was to pay for stock in Citrus Machinery Company, Inc., bought from S.A. Smith.
Grandin Industries, Inc., the Ohio corporation, was the plaintiff herein and not Grandin Industries of Florida, Inc. The latter was the party to the escrow agreement  not the plaintiff. The plaintiff, therefore, had no rights in the escrow agreement that it could enforce. Furthermore, Count II did not plead any right in plaintiff to recover on said contract. It proceeded solely on the basis of plaintiff's standing as a stockholder of CMC, Inc. It is, therefore, apparent that the trial judge correctly applied the law in disposing of Count II.
For the foregoing reasons we conclude that the appellant has not demonstrated reversible error and that the summary judgment should be affirmed on both counts.
Affirmed.
*32 MAGER, J., concurs.
WALDEN, J., dissents, with opinion.
WALDEN, Judge (dissenting):
I respectfully dissent for the simple reason that the case was prematurely decided via summary judgment.
The central critical genuine issues have to do with whether the bank had good faith legal justification for its invocation of the insecurity clause, and the bank's conduct with reference to its accounts receivable financing and the Reynolds Metal Company invoice  all with particular reference to the requirements of UCC 671.1-208.
I would reverse on authority of Holl v. Talcott, Fla. 1966, 191 So.2d 40, and remand for a full trial on the merits.