Argued May 10, 1974, affirmed February 21, 1975

MODOC MEAT & CATTLE CO., *Appellant, v.*
FIRST STATE BANK OF OREGON, *Respondent.*

532 P2d 21

*Mark McCulloch,* Portland, argued the cause. for appellant. With him on the briefs were William B. Reisbick and Ralf H. Erlandson of Erlandson & Reisbick, Milwaukie.

*Francis E. Marsh* of Marsh, Marsh, Dashney & Cushing, McMinnville, argued the cause for respondent. With him on the brief was J. W. Rosacker of McCarty & Rosacker, Portland.

Before O'CONNELL, Chief Justice, and DENECKE, TONGUE, HOWELL, and BRYSON, Justices.

BRYSON, J.

This is an action to recover damages for an alleged breach of contract to extend credit. The trial court granted defendant's motion for a directed verdict and entered judgment accordingly. The plaintiff appeals.

Plaintiff is the successor to Long Creek Meat Company, a corporation (Meat Co.), under a chapter XI arrangement following its voluntary petition to be "adjudicated a bankrupt." Plaintiff will be referred to as Meat Co. Meat Co. and First State Bank of Oregon (Bank) were parties defendant in *Baker Prod. Credit v. Long Cr. Meat,* 266 Or 643, 513 P2d 1129

(1973), wherein we held Bank liable to pay $88,343.96 to Baker Production Credit Association, covering eight drafts drawn by Meat Co. on defendant Bank, for the conversion of cattle which were subject to a perfected security agreement in favor of Baker Production Credit Association.

We view the evidence in a light most favorable to plaintiff. Basically, plaintiff contends that Bank is liable in damages for wrongfully dishonoring "Bill of Sale Drafts" drawn by plaintiff on defendant Bank. Following April of 1965 Mr. Troutman, a stockholder and president of Meat Co., successionally as a stockholder or partner became the comptroller, manager, or president of Coast Packing Company (Coast Packing), Portland, Ontario Rendering Company (Rendering Co.) at Ontario, and Deer Creek Cattle Feeders (Cattle Feeders) at Monument. Mr. Troutman, with the assistance of defendant Bank, conceived of the idea of issuing a "Bill of Sale Draft" on defendant Bank which Bank would honor in an amount up to Meat Co.'s established line of credit with Bank. Cattle were purchased by Meat Co. by issuance of a draft on defendant Bank. The cattle were then slaughtered at one of Meat Co.'s plants. From there the beef carcasses were trucked in halves to Coast Packing for processing and sale on the market. The offal was trucked to Rendering Co. By agreement, Coast Packing paid for the carcasses by payment directly to Bank to the credit of Meat Co. The drafts signed by the drawer represented a debit to Meat Co.'s line of credit and Coast Packing payments represented a credit to the line. Also by agreement, Coast Packing purchased all of Meat Co.'s carcass shipments.

Cattle Feeders was a partnership formed "to

finance cattle and put them in a feed lot." Meat Co. had approached the Bank and later Baker Production Credit Association to arrange financing for the purchase of additional cattle. Bank was not interested in this kind of financing, and Baker Production Credit Association couldn't loan money to corporations such as Meat Co. Some of the stockholders in Meat Co. formed the Cattle Feeders partnership in order to obtain approximately $1,000,000 in financing from Baker Production Credit Association and to insure having additional cattle on Meat Co.'s feed lot at Monument.

A written agreement was executed on December 9, 1965, between Meat Co. and Bank, which stated:

> "In the normal course of business, we find it necessary to issue Bill of Sale drafts to cover the purchase of livestock. We have also found it necessary to request a line of credit from your bank to assist us in the purchasing of said livestock, and for other operating expenses. In consideration of your bank extending the requested credit, we hereby agree to the following:
>
>> "That each draft properly drawn and issued by persons whom we may authorize from time to time, and which drafts may be accepted by you for payment, may be treated as our evidence of indebtedness and for all effect and purposes be treated as a note and may be charged by you directly to our liability ledger indicating the total of our indebtedness. * * * It is also understood and agreed that all livestock as described on the individual Bill of Sale draft forms will become the sole property of the First State Bank of Oregon, and that said livestock will be held by us in trust for said bank until said drafts have been paid in full."

Meat Co. and Bank did not enter into an express written contract extending any stated minimum

or maximum amount of credit to Meat Co. Bank charged no formal commitment fee and Meat Co. was not required to maintain a compensating balance. Mr. Troutman testified:

"A   It was just a revolving line of credit for use in payment of cattle in the amount of $25,000.

"Q   When you say a revolving line of credit, now that's a new term for all of us here since we started. Can you tell us what that meant to you?

"A   It meant that as long as we paid back the money, why, it was available to use again. We could borrow $10,000 and if we paid that back, then we'd have $25,000 we could borrow. If we owed $15,000, we could borrow another 10. If we paid the 15 back, we could borrow 25.

"Q   So the ceiling stayed the same, is that correct?

"A   Yes, sir."

The line of credit was $25,000 in 1965. By March 19, 1968, the credit line was increased to $200,000 and a security agreement was executed by Meat Co. and Bank. This was secured by an assignment of the Meat Co.-Coast Packing output sales contract and the guarantee of Emanuel J. Linke, Mr. and Mrs. Troutman, and Christensens (stockholders or officers of Coast Packing.).

During 1967 and 1968 Meat Co. tried to expand its operation by purchasing and remodeling a packing house at Ontario, Oregon, construction of a rendering plant at Ontario, and a feed lot at Monument, Oregon. A substantial sum of Meat Co. money was used in this effort without obtaining additional equity capital or long-term financing. The evidence, consisting of financial statements and tax returns, shows that Meat Co.

was also operating at a substantial loss although their dollar cash flow was increasing.

As a result of the expansion expenditures, Meat Co., by mid-1968, was overextended in its use of its line of credit with defendant Bank. Mr. Troutman testified:

"Q But in your cash flow you had money that you could have reduced the line with, didn't you?

"A We could have done anything with the money, yes, sir.

"Q I know, but instead of doing that, you went and built the feed lot, didn't you?

"A Yes, sir."

In December of 1968, at the insistence of Bank and E. J. Linke, Meat Co.'s guarantor, the line of credit was reduced by $105,000, to $95,000. This was accomplished by Meat Co. executing a note payable to Bank for $105,000 and payment of the note was guaranteed in writing by E. J. Linke, Coast Packing, and Mr. Troutman. Mr. Troutman testified:

"Q * * * The bank gave you credit against the draft line for the $105,000 note, didn't they, for some notes that you owed in the draft line?

"A Yes. The draft line was reduced by the amount owing on—the draft line was reduced by $105,000, right."

During 1969 it became increasingly clear that Meat Co. was in financial trouble, and it was further agreed, through a series of meetings between representatives of Meat Co., including Mr. Troutman, and Bank, including Mr. Finley, Executive Vice President of defendant Bank, that the existing $95,000 line of credit would be reduced by monthly payments of $2,000 or $3,000 so that on January 29, 1970, the approved maximum line of credit was approximately $88,000.

Meat Co. had continued to issue drafts for the purchase of cattle in excess of their line of credit with Bank. Bank would call Meat Co. and Coast Packing to determine if additional payments were to be made to Bank. When they were told that payments were forthcoming from Coast Packing for meat carcasses they had received, Bank would hold the drafts and when the money was received they would honor and pay the oldest draft.

The Bank records disclose that on January 28, 1970, the sum of $221,780.02 had been advanced to Meat Co. by Bank on the draft line of credit. Mr. Troutman testified that according to his records Meat Co. owed Bank $211,000 on the draft line of credit.

On January 29, 1970, at the request of Bank, a meeting was held between Mr. Finley of Bank and Mr. Troutman of Meat Co. Mr. Troutman testified on direct examination:

"Q   I'd like you to recount for us exactly what was discussed between you and Mr. Finley on January 29th, 1970?

"A   Mr. Jeffries was also present at the meeting, and it was a rather short meeting, which Mr. Finley said that the line of credit was at $221,000, as I recall, and that there were other drafts being presented for payment and that they couldn't pay any more drafts until they received some additional money."

Following this meeting, drafts totalling $96,000 were dishonored by defendant when presented for payment. Eight of the drafts were those made to the order of Baker Production Credit Association in the total sum of $88,343.96, which this court held Bank liable to pay to Baker Production Credit Association.

A further meeting between the parties was held

at the Bank on February 10, 1970. From the records, it is not clear what, if anything, was agreed upon as a result of this meeting. However, one of the purposes in holding the meeting was to secure an arrangement which would enable defendant to pay the eight dishonored drafts issued to the order of Baker Production Credit Association. If Meat Co. and its guarantors would deposit an additional $45,000 of new money, defendant Bank offered to match this amount and honor the Baker Production Credit Association drafts.' Meat Co. did not deposit the $45,000 new money.

Following the January 29, 1970, meeting and defendant Bank's refusal to honor further drafts, additional meat carcasses were accepted by Coast Packing and payment was made to Bank, reducing the line of credit for drafts drawn by Meat Co. to $144,869.36. Mr. Troutman testified on cross-examination:

"Q   Now, when you got down to where it was $144,869, you didn't have any cattle, Long Creek Meat Company didn't have any cattle, did you?

"A   We didn't have much of anything, no, sir.

"Q   You were broke, weren't you?

"A   That's the way it ended up."

On March 20, 1970, Bank wrote to Mr. Troutman, president of Meat Co., advising that the entire balance of Meat Co.'s loan, "totalling $144,869.36, is payable in full," together with interest in the amount of $949.07.

The trial court, in granting defendant's motion for a directed verdict, found that the evidence failed entirely to prove a material breach of contract by defendant; the evidence failed to prove any reasonable basis for the claim that a breach by defendant was the cause of damage to Meat Co., and that the evidence

failed to prove any reasonable basis for the determination of the nature, extent, and amount of damage. We agree with the trial court.

Plaintiff's complaint sets forth the alleged agreement to extend credit on the part of the Bank and that on "January 29, 1970, defendant without prior or any notice to Long Creek, or reassignment of said sales contract, and in breach of its agreement with Long Creek, commenced a course of dishonoring bill of sale drafts drawn by Long Creek when presented for payment," and defendant made no communication to Long Creek prior to dishonoring the Bill of Sale drafts. The complaint also alleges "[t]hat Long Creek has duly performed all the conditions of said agreement on its part to be performed."

The evidence adduced clearly shows that Meat Co., by its attempted expansion without adequate financing, became overextended and overdrew on its line of credit. When we add the $88,343.96 to the line of credit which this court ordered the Bank to pay on drafts to Baker Production Credit Association, Meat Co.'s line of credit was grossly overdrawn. Certainly Meat Co. had not performed all of the conditions of the contract on its part to be performed because it failed to make payments covering the drafts that were issued for the purchase of cattle. The evidence failed to prove a material breach of contract to extend credit by defendant.

■ In the field of finance and banking, the expression, "line of credit," has a well-defined meaning. It signifies a limit of credit extended by a bank to its customer, to the full extent of which the customer may avail itself in its dealing with the bank, but which the customer may not exceed. It most frequently covers

a series of transactions, in which case, when the customer's line of credit is nearly exhausted or not replenished, the customer is expected to reduce its indebtedness by payments to the bank before making additional use thereof. 21 CJS Credit, p. 1044; *Pittinger v. Southwestern Paper Co.*, 151 SW2d 922, 925 (Tex Civ App 1941).

■■ The law is clear that, between a bank and its customer, a bank is not obligated to honor and pay overdrafts, regardless of its conduct in paying prior overdrafts, in the absence of an agreement to the contrary. Brady on Bank Checks, § 11.1 (4th ed 1969). Plaintiff concedes this point in its reply brief. See also 5A Michie on Banks and Banking, § 214 (Perm ed 1973). Notwithstanding this, Meat Co. argues that even if defendant Bank was entitled to dishonor Meat Co.'s overdrafts, it was conditioned upon defendant giving Meat Co. advance notice of such dishonor. Without passing on the legality of plaintiff's contention, we conclude from the evidence that such notice was given to Meat Co. beginning with the October 1969 meeting and concluding with the January 29, 1970, meeting.[①] Further, Bank offered to honor the overdrafts to Baker Production Credit Association if Meat Co. or its guarantors would match $45,000 from the Bank, all of which Meat Co. failed to do.

■ In essence, plaintiff's claim for damages is grounded upon the liability of a bank for the wrongful dishonor of a draft item. ORS 74.4020 (Uniform Com-

---

[①] See our finding of facts in Baker Prod. Credit v. Long Cr. Meat, 266 Or 643, 648, 513 P2d 1129 (1973). Many of the principal witnesses in the case at bar, including Mr. Troutman of plaintiff Meat Co. and Mr. Finley of defendant Bank, testified in *Baker Prod. Credit*. The testimony from the transcript in that case was frequently referred to and used in the trial of the case at bar.

mercial Code 4-402) provides that a bank is liable to its customer for damages proximately caused by the wrongful dishonor of a draft. Since Meat Co. was without (overdrawn) rather than within its approved line of credit, defendant Bank was entitled, as to Meat Co., to dishonor drafts in excess of the approved line of credit. See Legislative Counsel Committee Comments to Oregon's Uniform Commercial Code, ORS 74.4020 (1962), at page 231. Also see Brady on Bank Checks, § 11.1 (4th ed 1969).

For the reasons above-stated, we conclude that the trial court did not err when it found that plaintiff had failed to prove a material breach of contract by defendant, and therefore the trial court properly allowed defendant's motion for judgment on a directed verdict. This conclusion disposes of plaintiff's further arguments, and particularly as to damages.

Affirmed.