**Stephen J. SHAUGHNESSY,
Plaintiff-Appellant-Respondent,**

v.

**MARK TWAIN STATE BANK,
Defendant-Respondent-Appellant.**

Nos. 50091, 50109.

Missouri Court of Appeals,
Eastern District,
Division Four.

Sept. 9, 1986.

W. Scott Pollard, Florissant, for Stephen J. Shaughnessy.

Stephen B. Higgins, St. Louis, for Mark Twain State Bank.

PUDLOWSKI, Judge.

Stephen J. Shaughnessy brought this action for breach of contract and prima facie tort against Mark Twain State Bank (Mark Twain). The trial court sustained Mark Twain's motion for a directed verdict on the prima facie tort claim and sustained in part and denied in part Mark Twain's motion for a directed verdict on the claim for breach of contract. After the case was submitted to the jury, both parties waived their right to a jury trial. The court then entered a judgment for Shaughnessy on the breach of contract claim and awarded him $28,-200.00 in damages. Mark Twain appealed the judgment against it and Shaughnessy appealed the directed verdicts on prima facie tort and on certain damages stemming from the breach of contract. We affirm.

In 1978, Shaughnessy purchased Questover Canyon, fifty-eight acres of undeveloped land in west St. Louis County, from Mr. and Mrs. Jerald Alpert for $300,000.00. Shaughnessy signed a promissory note for $209,000.00, secured by a first deed of trust, payable to the Alperts with interest at eight percent due annually. The principal would be paid from the proceeds from the sale of the eighteen lots subdivided in the tract. Additionally, as each lot was sold, Shaughnessy would receive a pro-rated share of his $18,000.00 commission from the Alperts and they would release their deed of trust as to that lot.

In order to develop the raw land, Shaughnessy sought financing from Mark Twain. On August 16, 1979, both parties agreed that Shaughnessy would receive a $50,000.00 line of credit from Mark Twain, "[o]n demand, and if no demand [is] made, then on February 16, 1980." The bank charged a one percent ($500.00) "commitment fee" for this line. A variable rate of interest was to be paid monthly, calculated at the bank's prime rate plus two percentage points. Additionally, the Alperts agreed to subordinate their deed of trust on five of the lots so that Mark Twain could secure a first deed of trust on them. At that time, Mark Twain considered the lots to be worth approximately $20,000.00 each.

Through the second half of 1979, Shaughnessy drew on approximately $33,-000.00 of this line of credit which he expended on development. Additionally, on November 20, 1979, he signed a promissory note for a second line of credit for $10,-000.00 from Mark Twain. This note was payable on demand or, if no demand was made, on November 20, 1980, with fixed interest of 11.4%. Throughout 1979, Shaughnessy sold several of the lots in the project. By late 1979, Shaughnessy ceased work on the project because of the approaching winter. Although his development work stopped, Shaughnessy informed Mark Twain of his intention to resume work in the spring of 1980. Throughout this time, and until April 1980, Shaughnessy was current on the interest on his various obligations. Moreover, in February 1980, Mark Twain extended the due date on the $50,000.00 line of credit to February 16, 1981.

In April, Shaughnessy approached Mark Twain for additional funds to pay Union Electric for installing power lines. At this time, his loan officer had been changed and he failed to receive assistance on his requests. He next spoke with Richard Jensen, the president of the Bank, who informed Shaughnessy that he would evaluate the request by visiting Questover Canyon with Ed Holthaus, a west St. Louis County developer. On April 22, 1980, Shaughnessy and Jensen met at Mark Twain. There, Jensen informed Shaughnessy that the bank would no longer grant him any additional funds from the undisbursed portion of the line of credit. Jensen gave Shaughnessy no reason for this change except to say that the bank wanted nothing more to do with the project.

On April 30, 1980, Shaughnessy missed the interest payments on his note for $50,-000.00. In July 1980, Shaughnessy sold two lots in Questover Canyon for $21,-000.00. These lots were the ones on which Mark Twain held a first deed of trust. Mark Twain received a "payoff" of $13,-

353.52 of which $3,353.52 was applied to the $50,000.00 line of credit, reducing the balance to $30,030.28. The remaining $10,000.00 was used to pay off the $10,000.00 second line of credit. Additionally, Shaughnessy paid the delinquent interest of $1,852.19 on both notes. Shaughnessy testified that the bank did not inform him that Mark Twain intended to extinguish the lower interest note before applying the proceeds to the secured $50,000.00 line of credit.[1]

Afterwards, Shaughnessy attempted to obtain financing elsewhere but failed. He missed interest payments from October to December 1980. On January 5, 1981, Shaughnessy sold other lots in Questover Canyon. These lots were not subject to Mark Twain's deed of trust. Shaughnessy realized $8,215.05 net profit from the sale. He informed Mark Twain of this sale and told them he was not planning to use the proceeds to pay the interest. On January 7, 1981, Mark Twain sent Shaughnessy a letter advising him that he was in default and demanding payment of the note. The bank gave him ten days to cure this default by remitting the interest then due in the amount of $1,553.65. The bank further advised him that it would foreclose on the three lots on which it held a deed of trust if he did not pay. Shaughnessy did not pay and in March of 1981 the bank foreclosed. At the sale, Mark Twain purchased the lots for $33,282.68, the amount of principal, interest, and expenses owed.[2]

Shaughnessy then brought this action. In essence, his claim embodied two theories. First, he asserted that Mark Twain breached its agreement to lend funds to him, thereby causing him to sustain the following damages as denominated in paragraph (1) of his petition:

a. Plaintiff has lost the three above described lots 6, 7 and 8 of Questover Canyon Subdivision by Defendant Bank's foreclosure thereon, said lots having a value of $20,000.00 per lot before any improvements were made, for damages in the amount of $60,000.00

b. Plaintiff has lost the increase in value to the three above described lots, if Defendant Bank had not breached the agreement and had paid the remaining money to plaintiff as agreed, in the amount of $30,000.00.

c. Plaintiff has lost the increase in value to the remaining lots in Questover Canyon Subdivision owned by plaintiff, in the amount of $70,000.00.

d. Plaintiff has lost the profit from the subsequent construction of residential homes by plaintiff on the residential lots owned by plaintiff, in the amount of $100,000.00.

e. Plaintiff has been unable to complete the project as contemplated because of the refusal by Defendant Bank to loan the additional money, and has sustained damage due to the depreciation in value of the lots, in the amount of $35,000.00.

f. Plaintiff has been unable to complete the project as contemplated because of the refusal by Defendant Bank to loan the additional money, and has sustained damage in that the work already done has deteriorated, requiring plaintiff to expend even greater sums in the future to complete the project, to plaintiff's damage in the sum of $8,000.00.

---

1. There is some dispute as to whether the $10,000.00 line of credit was secured by the Questover Canyon lots. On one hand, the $50,000.00 line of credit, the "collateral schedule" and the deed of trust attached to it evidenced a future indebtedness or "dragnet" clause. But the line of credit itself and the testimony of Mark Twain's officer Duffy indicated no such intention.

2. At trial, Mark Twain vigorously disputed Shaughnessy's version, contending instead that it visited Questover Canyon with Holthaus and ceased disbursement in June, after Shaughnessy missed his April and May interest payments. Where there is a conflict in the evidence, we must accept as true all evidence and permissible inferences favorable to the prevailing party. *Elliott v. West*, 665 S.W.2d 683, 690 (Mo.App. 1984). In its brief, Mark Twain states that the actual dates are "immaterial to this appeal, because all parties agree that Mark Twain officials had visited the project site prior to its decision" to refuse disbursements.

g. Plaintiff has been and will be forced to incur additional expense to complete the project as contemplated, because of increased labor and material costs, in the sum of $20,000.00.

The sum of his damages prayed for was $323,000.00 His second theory sounded in prima facie tort and reiterated the same damages plus one million dollars in punitive damages. Later, Shaughnessy unsuccessfully moved to amend his petition to include damages of $88,000.00 for loss of a contract contingent on the installation of underground utilities. The trial court also denied his motion to increase the amount prayed for in sub-paragraph g to $70,000.00 and to increase the prayer for the non-punitive damages to $525,000.00.

At the close of Shaughnessy's evidence, the trial court sustained Mark Twain's motion for a directed verdict on Shaughnessy's prima facie tort claim. In addition, the trial court granted in part and denied in part Mark Twain's motion for a directed verdict at the close of all the evidence. Specifically, it overruled a directed verdict as to the breach of contract theory itself and to Mark Twain's affirmative defenses of Shaughnessy's failure to mitigate damages by his refusal to pay interest and his failure to perform numerous conditions precedent to Mark Twain's performance. The trial court, however, granted directed verdicts to Mark Twain on all of the damage issues with the exception that it allowed Shaughnessy to claim damages for the loss of the three foreclosed on lots, but only for $27,000.00 and not for the full $60,000.00 prayed for in his petition [3] and $1,200.00 instead of $8,000.00 for deterioration and increased material and labor costs.[4]

Thereafter, the case was submitted to the jury. After one and one-half days of deliberation, it became apparent that the jury would be unable to reach a verdict. As a result, both parties waived trial by jury. Thereafter, the trial court found for Shaughnessy and awarded him $28,200.00 in damages. Both Shaughnessy and Mark Twain appeal.

We first address Shaughnessy's appeal. He raises three points: (1) the trial court erred by sustaining Mark Twain's motion for a directed verdict on Shaughnessy's claim for prima facie tort; (2) the trial court erred in granting Mark Twain's motion for a directed verdict as to certain damages; and (3) the trial court erred by excluding certain evidence.

In his first point, Shaughnessy asserts that the trial court erred in granting Mark Twain a directed verdict on the issue of prima facie tort. He states that he made a submissible case on all the elements and therefore the issue should have been submitted to the jury. We disagree. In this jury-waived, court-tried case, we are obliged to sustain the trial court unless there is no substantial evidence to support it; unless it is against the weight of the evidence; unless it erroneously declares the law or unless it erroneously applies the law. *Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Shackford,* 591 S.W.2d 210, 213 (Mo.App.1979).

"Recent decisions have left doubt as to the viability of the prima facie tort theory." *Costello v. Shelter Mutual Insurance Company,* 697 S.W.2d 236, 237 (Mo.App. 1985). Under prima facie tort, Shaughnessy was required to prevail on four elements: (1) that Mark Twain performed an intentional, lawful act; (2) that Mark Twain intended to injure him; (3) that he sustained injury; and (4) that Mark Twain lacked sufficient justification for its refusal to disburse. *Bandag of Springfield, Inc. v. Bandag, Inc.,* 662 S.W.2d 546, 552 (Mo. App.1983).

In the present case, we cannot say that the court's finding of no prima facie tort was against the weight of the evi-

**3.** Shaughnessy's evidence valued the lots at $60,-000 total. The court then subtracted $33,000, the approximate amount of Shaughnessy's debt to Mark Twain.

**4.** The evidence indicated that certain work which could have been performed in 1980 for $4,000 would now cost $5,200.

dence. The element of intent to injure carries a heavy burden of proof. Words such as "malice" have been used to describe it. *Costello*, 697 S.W.2d at 238. It is more than merely the intent to perform the act that injured the plaintiff. "It is the critical intent to cause injury which must be proved." *Dowd v. General Motor Acceptance Corp.*, 685 S.W.2d 868, 874 (Mo. App.1984). Here, the only evidence that indicates a questionable intent to injure Shaughnessy was that the bank once inspected the development site with Holthaus, a St. Louis County developer. Shaughnessy's other contention that the bank knew him not to be a good risk merely goes to Mark Twain's awareness that injury might result. That injury might be the natural and probable consequence of Mark Twain's act is not the same as the "malice," "spite," or "ill will" demanded for prima facie tort. *Id.* at 874–875. We deny Shaughnessy's first point.

In his second point, Shaughnessy argues that the trial court should not have granted Mark Twain's motion for a directed verdict as to certain damages. These damages can be divided into two categories: (1) the damages for lost profits in sub-paragraphs b, c, d and e which alleged that had there not been a breach, the improved lots in Questover Canyon would have been more valuable; and (2) the damages alleged in sub-paragraph g for the increased material and labor costs resulting from the bank's failure to disburse which caused a postponement of the development.

■ We agree with Shaughnessy's point that damages for breach of contract include all those which are the proximate and natural consequences of the breach. *Liberty Financial Management Corp. v. Beneficial Data Processing Corp.*, 670 S.W.2d 40, 57 (Mo.App.1984). Nevertheless, "[t]he party who seeks to recover ... has the burden to show not only the breach, but that damages have in fact occurred as a direct and natural consequence thereof." *Herbert & Brooner Construction Co. v. Golden*, 499 S.W.2d 541, 550 (Mo.App. 1973). Here, Shaughnessy had the burden

of proving that his alleged damages did accrue and were caused by Mark Twain's failure to disburse. In light of our standard of review, and after a careful review of the whole record, we cannot say that the trial court's finding was erroneous. Shaughnessy's second point is denied.

■ In his third point, Shaughnessy argues that the trial court should have admitted into evidence the sales contract he entered into with Frank J. Hollis for the purpose of establishing the value of the lots in Questover Canyon. Before trial, Shaughnessy attempted to amend his Third Amended Petition to include the loss of profits from the Hollis contract. The trial court denied this amendment.

Nevertheless, Shaughnessy attempted to introduce the contract into evidence at trial. Hollis signed this contract to purchase four lots from Shaughnessy for $88,000.00 with owner financing of eight percent. As a condition precedent to the sale, Shaughnessy was required to install the desired utilities. When that did not occur, the sale did not close. The trial court refused admission of the contract because the contract failed.

Rule 84.13(b) provides that we shall not reverse a judgment unless we find that the trial court's error materially affected the merits of the action. According to Shaughnessy, this contract was admissible to establish the value of the subdivision lots. If that be the case, then the admission of the contract would be redundant. At trial, Hollis gave detailed testimony on redirect examination regarding the $2,500.00 down payment, the $88,000.00 contract price, and the 8% interest rate. Shaughnessy's third point is denied.

We next address Mark Twain's appeal. The bank raises two points: (1) the trial court erred in awarding Shaughnessy damages of $28,200.00 and (2) there was no substantial evidence that Mark Twain breached the contract. We address Mark Twain's second contention first.

This point has two sub-points. First, Mark Twain asserts that as a matter of

law, a lender cannot be liable for breaching a contract to lend when the note is payable on demand. Second, the bank contends that if we impose a good faith requirement for failure to disburse, then Shaughnessy failed to make a submissible case alleging that Mark Twain acted in bad faith when it deemed itself insecure.

Mark Twain proclaims that the note in question is a demand note.[5] With a demand note, a cause of action accrues against the maker on its date or date of issue, and payment must be made whenever demand is made. The demand need not be made in good faith. *Centerre Bank of Kansas City, N.A. v. Distributors, Inc.,* 705 S.W.2d 42, 47–48 (Mo.App.1985). Relying on the Western District's decision in *Centerre,* Mark Twain argues that when it disbursed the $17,000.00 to Shaughnessy in April 1980, it could have immediately demanded repayment. Mark Twain contends that this is the same as refusing to disburse. Therefore, Mark Twain alleges that it did not breach its agreement with Shaughnessy. We disagree.

On August 16, 1979, Shaughnessy signed a promissory note which stated:

"On demand, and if no demand is made, then on the 16th day of February, 1980, the undersigned ... promise[s] to pay to the order of Mark Twain State Bank (the "Bank"), ... the sum of fifty thousand and 00/100 Dollars, with interest thereon from date payable monthly ... equal to two percent in excess of ... the "Prime Rate " ... *until the unpaid principal balance shall be due and payable (whether at maturity,* on demand or otherwise" and thereafter at a rate equal to ... three percent in excess of the Prime Rate.... In the event any of the undersigned is an individual, this interest rate *both before and after maturity* or demand shall not exceed this

highest rate of interest permitted by law ... The undersigned ... waive[s] presentment for payment, demand for payment, protest and notice of every kind and nature in reference to this Note, and agree[s] that holders, at holder's option, may extend, renew, or revise payment of this Note." (emphasis added). In the margin, Mark Twain added "Secured by 1st D/T on 5 lots."

On February 16, 1981, Mark Twain unilaterally extended the note for an additional year:

The parties acknowledge that the undersigned ("Borrower") is indebted to Mark Twain State Bank (the "Bank") under the terms of a promissory note dated August 16, 1979 in the original principal amount of $50,000.00 (the "Note"), the unpaid balance of which is $33,383.80. The Note is secured by a Deed of Trust.... *In consideration of the extension of credit by Bank to Borrower, the parties hereby agree to extend and modify the Note so that it comes due On February 16, 1981....* This Agreement is executed as an extension or modification only, and not a novation; and except as herein provided, all of the terms and conditions of the Note and Deed of Trust and of any other deed of trust, security agreement and other document of lien or encumbrance of Borrower being held by the Bank shall remain in full force and effect. (emphasis added).

The deed of trust signed August 16, 1980 included language stating:

"16. Any of the following shall constitute an event of default hereunder: [seven events are listed]." ... "But, if default be made in the performance of the obligations secured hereby, or in the performance of the covenants of this Indenture, then and in either of said events the obligations secured hereby then remain-

---

**5.** Mark Twain cites *Brown v. Maguire's Real Estate Agency,* 121 S.W.2d 754 (Mo.1938), as holding that a note payable "[o]n Demand, and if no demand be made then on the 1st day of February, 1933" is a demand note. However, when *Brown* came before this court, the language was held *not* to be a demand note within

the meaning of the negotiable instruments law. *Brown v. Maguire's Realty,* 101 S.W.2d 41, 49 (Mo.App.1937). The Missouri Supreme Court overruled *Brown* on other grounds. *Brown,* 121 S.W.2d at 759. *See Exchange National Bank of Chicago v. Crest Finance Co.,* 53 Ill.App.2d 255, 203 N.E.2d 58, 60 (1964).

ing unpaid, together with all arrearages of interest, *shall immediately become due, payable and collectible regardless of maturity.*" (emphasis added).

We also quote the following pertinent language from the security and pledge agreement which was signed contemporaneously to the deed of trust:

7. Undersigned agrees that the occurrence of any of the following events shall constitute a default hereunder: (1) failure of Undersigned to pay *at maturity,* or at any *accelerated maturity,* any Liability to Bank; ... (5) any representation or statement made or finished in any manner to bank by or on behalf of undersigned in connection with any liability proves to have been false in any material respect when made or furnished; ... (9) if Bank deems itself insecure; ... (12) the determination by Bank that a material adverse change has occurred in the financial condition of Undersigned from the condition set forth in the most recent financial statement of Undersigned therefore furnished to Bank, or from the condition of Undersigned as therefore most recently disclosed to Bank in any other manner; ... Upon the happening of any one or more of such events of default all Liabilities *shall become forthwith due and payable at the option of Bank.* (emphasis added).

■ In the present case, Shaughnessy's note was not a demand note. Recent case law supports this conclusion. *In Reese v. First Missouri Bank and Trust Co.,* 664 S.W.2d 530 (Mo.App.1983), this court rejected this contention that a demand note was created by language reciting the following:

On demand and if no demand be made then principal and interest is payable in monthly installments of $1,040.96 commencing on April 6, 1981 and that day of each succeeding month until maturity, March 6, 1984.

*Id.* at 536–537.

RSMo § 400.3–108 states "(i)nstruments payable on demand include those payable

at sight or on presentation and those in which no time for payment is stated." *Reese* cites several interpretations of that statute which hold that "a demand note, on issue, is mature and due" and that "[n]o prior demand need be made in order for a cause of action to accrue on a demand instrument." 664 S.W.2d at 535.

The court determined the intent of the parties from its reading of the entire agreement, the subsidiary agreements between the parties, and external circumstances. After analyzing the promissory note, the deed of trust, and other documents, the court found several contractual terms inconsistent with a demand note such as the typewritten phrases "until maturity, March 6, 1984" and the printed words "become due at option of holder" in the promissory note. It also noted the conditional phrase "[i]n the event that ... the principal note secured hereby shall at the option of the holder be immediately due and payable" which was typewritten in the deed of trust. *Id.* at 536. The court held that these terms negated demand note status because the word "maturity" and the phrase "become due at option of holder" of the promissory note are inconsistent with the concept that a demand note is due and mature on issue.[6] The court additionally found the deed of trust's conditional phrase would be unnecessary if the note were a demand note since it would be payable whether or not the conditional event occurred. *Id.* at 536. The court then concluded that the *Reese* note was an installment note and that it was payable on demand only in the event of default in the making of the installment payments or the performing of the obligations imposed on the Reeses' by the deed of trust. *Id.* at 536–537.

In the present case, the Shaughnessy note is susceptible to a similar interpretation. First, the words "[o]n demand, and if no demand is made, then on the" are printed on the form, but according to the note's language the date February 16, 1980 is

6. Section 400.3–118(b), RSMo 1978, provides that in construing instruments typewritten

terms control printed terms. *Reese,* 664 S.W.2d at 536.

typewritten in. Second, the interest rate is prime plus two but after the note becomes *"due and payable* (whether at *maturity,* on demand or otherwise)" the interest rises to prime plus three. In addition, paragraph 16 of the deed of trust lists eight events which constitute default. The deed itself recites 26 paragraphs of covenant by Shaughnessy. The deed then states that defaults or failure to perform the covenants shall cause the obligation to become due and payable regardless of maturity. Again, we apply the court's analysis in *Reese* to underscore the point that a demand note is, on issue, due. Further, Shaughnessy, in the security at pledge agreement, agreed that failure to pay at maturity constituted default. Therefore, had the note been a demand note it would be mature and Shaughnessy would have been immediately in default. Likewise, with the deed of trust language, if this were a demand note, the note would not need default for it to be due and payable at the option of the bank. It would already have been due. Finally, the promissory note extension and modification, states that "the parties agree to extend and *modify* so that the note becomes due on February 16, 1981." (emphasis added). *The word demand cannot be found on this modification.*[7] A savings clause incorporated all of the terms and conditions of the first note, but this only included the terms the extension/modification note did not modify.

Therefore, we hold that the promissory note in question was not a demand note. Accordingly, Mark Twain's reliance on the Western District's decision in *Centerre,* 705 S.W.2d 42, is inapposite.[8]

In the alternative, Mark Twain argues that even if the note was not a demand note, that three events of default occurred as specified in paragraph 7 of the security and pledge agreement: (1) the bank deemed itself insecure; (2) the bank determined that a material adverse change had

occurred in the financial condition of Shaughnessy; and (3) material falsehood in the loan application. Thus, Mark Twain argues that since one or more of these three conditions were met the note was in default and breach of the contract to lend occurred. We disagree.

These are factual issues. Mark Twain vigorously asserts that after it visited the Questover Canyon site, it discovered that things were not as it had thought. Thus, Mark Twain then could have considered itself insecure or that a materially adverse change had occurred, thus triggering default by Shaughnessy. However, Shaughnessy's evidence was that the bank never gave him any reason for cutting him off. Certainly had the bank felt it was insecure it would have articulated its reasons to Shaughnessy. It did not and therefore, we cannot say the trial court was clearly in error in finding no default occurred.

Mark Twain also claims that Shaughnessy defaulted by filing a materially false loan application. Mark Twain urges us to reverse based on the fact that Shaughnessy's 1978 income was $24,000 when in fact, according to his income tax return it was only $684.06. We disagree. First, the record shows that Shaughnessy's income from insurance sales in 1978 was not a crucial factor in the loan process as was Shaughnessy's equity in Questover Canyon and the prospect for payoff through sales. Secondly, there is no evidence that Mark Twain was aware of this discrepancy until after it refused to disburse.

While demand note analysis is helpful, it is not completely on point, for this case involves the refusal to disburse from a line of credit and not the calling of a demand note. Shaughnessy sued Mark Twain for a breach of a contract to lend money. If Mark Twain's contract did not obligate it to disburse, then there was no breach. In other words, while Mark Twain could not call the $33,000.00 it loaned Shaughnessy,

---

7. Mark Twain attempts to bolster the modification by saying "the note was modified to fall due on demand, and if no demand is made, then on February 16, 1981."

8. While *Centerre* involved a line of credit, the language of the note was not presented in the case. Also, in *Centerre,* the parties agreed it was a demand note. 705 S.W.2d at 48 n. 2.

absent default, it argues that it had no contractual duty to lend the additional $17,-000.00.

The problem with this is that the documents are silent as to the terms of the line of credit especially the key term of whether Mark Twain enjoyed a right to refuse disbursal. Mark Twain established that there were certain conditions precedent to the disbursal of funds, but these were ministerial. Neither party cites us to any Missouri line of credit cases and the cases in the other jurisdictions are divided. *See Guaranty Bank v. Lone Star Life Insurance Co.*, 568 S.W.2d 431 (Tex.Civ. App.1978); *Grandin Industries, Inc. v. Florida National Bank at Orlando*, 267 So.2d 26 (Fla.Dist.Ct.App.1972) (both decisions dependent on specific terms in the letter of commitment); *Malaker Corporation Stockholder Protection Committee v. First Jersey National Bank*, 395 A.2d 222 (N.J.Super.Ct.App.Div.1978) (no obligation to disburse since agreement lacked critical terms).

In *K.M.C. Co., Inc. v. Irving Trust Co.*, 757 F.2d 752 (6th Cir.1985), the Sixth Circuit held that implied in a line of credit contract is an obligation of good faith. Under its facts, the Sixth Circuit concluded that this obligation *may* have imposed on the lender a duty to give notice before refusing to advance funds. *Id.* at 759.

Our brethren in the Western District, however, have rejected the imposition of a good faith obligation when a bank calls a demand note. *Centerre*, 705 S.W.2d at 48. When a bank calls a demand note, it is a more onerous burden on the debtor than when a bank refuses to disburse additional funds. Therefore, it would seem that there would be no good faith obligation in the present case despite the Sixth Circuit's holding in *K.M.C.* But as the Western District also noted, *K.M.C.* is inapposite on its facts. *Centerre*, 705 S.W.2d at 48. In *K.M.C.*, the lender required the borrower to deposit *all* of his receipts in a "blocked account" to which the lender would have sole access. Then, the failure to advance funds would have left the borrower with-

out any operating capital unless he could have secured alternative financing. 757 F.2d at 750–760. Mark Twain did not require Shaughnessy to deposit all his proceeds from Questover Canyon with the bank and then forbade him access. The facts are sufficiently different so that *K.M.C.*, decided under New York law, can be distinguished.

*Midatlantic National Bank v. Commonwealth General, Ltd.*, 386 So.2d 31 (Fla.Dist.Ct.App.1980), states:

> A line of credit is a limit of credit to cover a series of transactions.... It does not impose upon the bank the legal responsibility to loan up to the limit or a responsibility of the lender to borrow up to the limit, but merely facilitates the easier extension of credit. Accordingly, if information later comes to light which reflects upon a borrower's ability to satisfy his debts, a bank need not fund the entire line of credit.

Therefore, it would appear that Mark Twain did not breach the contract. However, the Florida court included with its decision a footnote which provides us with a useful definition of a line of credit:

> Although definitions vary, it is useful for banks to distinguish lines of credit from commitments. A line of credit is a specified amount that can be borrowed from time to time and that can be cancelled by either party at any time. Every line carries a specific internal review date and is reviewed at least annually. *A commitment, on the other hand, is defined as an agreement signed by both borrower and lender for a specified amount and for a definite period—not to be cancelled except under the conditions set forth in the agreement. Every commitment must have a stated expiration date. For this assurance of credit availability, the bank's customer pays a fee.* Whenever a credit line or commitment is in effect, a loan can be made any time thereafter at the request of the borrower.

386 So.2d at 33 n. 1 (quoting Bank Administration Institute, Bank Administration Manual Volume I) (emphasis added).

We also cite another definition which does not make the distinction between a line of credit and a commitment:

Line of credit signifies a limit of credit extended by bank to its customer, *to the full extent of which the customer may avail itself* in its dealing with the bank, but which the customer may not exceed. It most frequently covers a series of transactions, in which case, when the customer's line of credit is nearly exhausted or not replenished, the customer is expected to reduce its indebtedness by payments to the bank before making additional use thereof.

*Modoc Meat & Cattle Co. v. First State Bank of Oregon,* 271 Or. 276, 532 P.2d 21, 25 (1975) (emphasis added).

In *Midatlantic,* the borrower did not pay a commitment fee. 386 So.2d at 33. The *Modoc* definition of a line of credit contemplates irrevocability because it speaks of a limit "to the full extent of which the customer may avail itself." [9]

■ In the present case, Mark Twain charged Shaughnessy a one percent *commitment fee* when it established the arrangement. Further, there was a stated expiration date, February 16, 1981.[10] While there was no express agreement, we hold that *under the above facts,* Mark Twain established an irrevocable line of credit for Shaughnessy. Mark Twain was obligated, barring default, to fund Shaughnessy.

Our holding does not mean that banks will be compelled to throw good money after bad. If the debtor defaults, the relationship can be ended. Nor does this mean the bank will be forced to make the all or nothing decision of lending or foreclosing if the borrower is defaulting. So long as there is a default, the lender can make the note due and payable and then extend payment as was done in *Centerre.* 705 S.W.2d at 46. Indeed, a bank can expressly inform its borrower that the arrangement is revocable or irrevocable.

Mark Twain's other point relied on states that the court erred in awarding Shaughnessy damages of $28,200.00. This point has three sub-points which assert that: (1) Shaughnessy's $27,000.00 loss of equity was directly caused by his failure to mitigate damages by paying interest on his loan; (2) that the loss of equity was not a consequential damage stemming from the breach of contract; and (3) that $1,200.00 in additional costs of road repairs was too remote and speculative.

"There is a well established principle of law known as the rule of avoidable consequences which requires that one damaged by breach of contract make reasonable efforts to minimize the resulting damages." *Wolf v. Missouri State Training School for Boys,* 517 S.W.2d 138, 142–143 (Mo. banc 1974). Mark Twain contends that Shaughnessy failed to minimize his damages for the loss of equity in the lots by refusing to pay the interest owed on the money previously disbursed. In other words, although Mark Twain breached its commitment to lend, there would not have been $27,000.00 in lost equity had Shaughnessy continued to pay the contractually provided for interest payments. When he discontinued paying the·monthly interest Mark Twain foreclosed.

■ It must be remembered, however, that the avoidable consequence rule only requires reasonable efforts to minimize resulting damages. Further, the burden of proof on this issue rests with the defendant. Mark Twain's assertion that the burden of proof on mitigation of damages rests with the plaintiff misstates a elemen-

9. We use the factors of a commitment fee, a definite time period, and the definitions as interpretative aids to assist us when the agreement is otherwise silent.

10. *See First Mississippi Bank of Commerce v. Latch,* 433 So.2d 946, 950 (Miss.1983), holding: "The contract [to lend] being of an indefinite nature was terminable at the will of either party but such termination could only be effectuated upon the giving of reasonable notice."

tary principle of law. "The burden of proof of mitigation of damages is on the defendant who must show the opportunity the injured party had to mitigate and the reasonable prospective consequences". *Braun v. Lorenz,* 585 S.W.2d 102, 108 (Mo. App.1979). *See also Strutt v. Laclede-Christy Co.,* 409 S.W.2d 691 (Mo.1966); *Vondias v. Titanium Research and Development Co.,* 511 S.W.2d 883, 886 (Mo.App. 1974). Mark Twain's purported authority for its argument is *Labor Discount Center v. State Bank & Trust of Wellston,* 526 S.W.2d 407 (Mo.App.1975). That case, while factually similar to the instant case, addresses a plaintiff's failure to show causation of the damage and not avoidable consequences. *Id.* at 426.

In deciding whether the trial court clearly erred in finding that Mark Twain failed to meet its burden of proof, we must review the evidence.[11] Mark Twain's evidence shows that Shaughnessy did not make a reasonable effort to mitigate. Soon after the breach occurred, Shaughnessy missed several interest payments which he later paid when funds came available. In autumn of 1980, he again fell behind. In January 1981, Shaughnessy realized over $8,200.00 from the sale of additional lots. When Mark Twain became aware of this sale and Shaughnessy's intent not to make the interest current, the bank sent Shaughnessy a demand letter. Shaughnessy's reaction is best captured by the following exchange which occurred between him and Mark Twain's counsel in court:

Q First, Shaughnessy, let's look at Plaintiff's Exhibit 36. Letter dated January 7, 1981, to you, from Keith Steinhoff.

A I have got that letter in front of me.

Q Did you receive that letter?

A Yes, I did.

Q That's dated January 7, 1981, right?

A Yes, sir.

Q And that is a letter that makes demand for the outstanding balance of $31,583.93 now due and immediately payable, correct?

A Correct.

Q Mr. Steinhoff then goes on to say, "You have ten days from receipt of this letter to cure this default by remitting current interest due in the amount of $1,553.65, correct?

A That is correct.

Q And you chose not to pay that amount, right?

A That is correct.

Q You chose not to pay that amount as a matter of principle by this time, is that right?

A That's a good word.

■ This would seem to sustain Mark Twain's burden of proof that Shaughnessy did not reasonably mitigate damages. Nevertheless, we as a reviewing court are not to review the case as if we were sitting as a trial judge. Our review must comport with the stringent standards of *Murphy v. Carron.* When we consider the other evidence such as Shaughnessy's precarious financial state of affairs in 1981, the high rate of interest charged on the money owed and the fact that Shaughnessy had continued to make the interest payments, albeit late, for the six months immediately after Mark Twain breached we cannot say that the trial court's opinion was against the weight of the evidence.

■ Mark Twain's second sub-point is that there was no substantial evidence that the loss of equity was a consequence of the breach. Specifically, Mark Twain says that Shaughnessy's failure to pay interest which resulted in the foreclosure, was neither caused by the alleged breach nor foreseeable at the time of contracting.

Mark Twain's argument is, in essence, the same logic that was used by the court in granting a directed verdict for Mark Twain as to damages for lost profits. But

11. Shaughnessy's only argument in opposition to Mark Twain's mitigation of damages point relied on is that Mark Twain abandoned the issue by failing to submit a jury instruction on the issue. Shaughnessy's argument forgets that he waived his right to a jury trial.

the difference here is that unlike lost profits, the damages for loss of equity are not too speculative or remote. It is one thing for the trial court to reject damages for any purported increase in value that did not materialize. It is not speculative to conclude that had Mark Twain not breached its commitment to lend, Shaughnessy would have been able to complete the project as planned. Mark Twain vainly argued that it was very unlikely that Shaughnessy would have finished. But the trial court as the fact finder need not accept Mark Twain's testimony. As with the trial court's finding rejecting certain of plaintiff's damages, we cannot say that it committed reversible error in finding for plaintiff on the loss of equity damages.

Mark Twain also argues that the loss of equity damages are not proper consequential damages in that they were not foreseeable at the time of contracting. Mark Twain, in its brief, says "it could not have known at the time of contract formation that its refusal to advance additional funds would leave plaintiff unable or unwilling to pay interest on monies already disbursed. Indeed, it seems most unlikely that Mark Twain would ever have entered into such a credit relationship. Any individual who must borrow additional funds to maintain interest payments on existing debt is hardly a satisfactory credit risk."

The assertion ignores the fact that Mark Twain understood the loan to be for the development of the Questover Canyon subdivision. Shaughnessy did not borrow money for the privilege of repaying it at prime plus two percent. He borrowed it so that he could improve land and sell it. When Shaughnessy could not get the funds required to develop the land it should not have then come as a surprise to a sophisticated banking institution that he would not be able to make the sales necessary to repay the loan.

Mark Twain's last sub-point argues that the additional cost of road repairs was too remote and speculative in that there was no evidence Shaughnessy actually incurred that cost. This point concerns the

$1,200.00 in damages for the increased cost of roadwork between the breach in 1980 and the trial. Mark Twain cites us to *Dunning v. Alfred H. May*, 483 S.W.2d 423, 428 (Mo.App.1972) which reversed a trial court's award of $7,000.00 in increased financing costs for a mortgage loan. The court reversed because there was no evidence the plaintiff had suffered any real loss since they had never contracted for the loan. *Id.* at 429.

The testimony of Paul Weis, Shaughnessy's expert, established that the present day cost of grading and installing the rock base was $5,280.00. There was also testimony that the 1980 costs of such services would have been $4,000.00. From this, the trial court found that Shaughnessy was damaged in the amount of $1,200.00. Mark Twain states that the $1,200.00 loss was "evidently derived from the difference in the cost of grading roads and installing a compacted rock base between 1980 and 1985." Mark Twain then states that it is hornbook law that damage for breach of contract are measured as of the date of the breach, citing *Dunning* for its authority. Finally, it says that since Shaughnessy had not committed himself to those costs there was no evidence that he sustained these damages.

The trial court accepted the logic of *Dunning* and found for Mark Twain on Shaughnessy's $20,000.00 prayer in paragraph 11 g for damages resulting from increased costs. However, the $1,200.00 in damages stems not from increased costs alone, but from paragraph 11 f for damages sustained because the work already done, having deteriorated, required Shaughnessy to expend greater sums in the future to complete the project.

Mark Twain attempts to narrow the breadth of Weis's testimony so as to convert the $1,200.00 into a damage disallowed by the *Dunning* principle. But, Weis's following testimony also established that Shaughnessy suffered a loss.

[W]e noticed in this area that there had been a substantial amount of erosion to the finished grade that was previously

accomplished, primarily due to the fact that the roadway wasn't completed and the overlay was not in place.

The same condition existed in this portion of the roadway, that a substantial amount of erosion had taken place, and that in our opinion it would require some additional finished grading in order to complete the project or the roadway.

\* \* \* \* \* \*

However, the finished grading figure that I gave you would not have been necessary in 1980 since it had already been done, in our opinion, and this additional grading work that would have to be done as a result of erosion that had been caused by the roadway not being completed.

The rock base is basically the same situation. The additional rock base that we estimated as a quality that would have to be done as a result of the road not being completed in 1980.

■ Thus, this case is distinguishable from *Dunning*. In *Dunning*, the court refused to allow recovery for interest rate increases on a loan because there was no evidence that the plaintiffs had even committed themselves to any particular loan. Here, too, Shaughnessy had not at the time of the trial committed himself to any particular contractor for road repair. But the crucial distinction is that, here, in 1979, Shaughnessy had paid for certain road work which was not completed. When Mark Twain breached, Shaughnessy was unable to put asphalt over the rock previously laid and as a result, the expense incurred in 1979 washed away and he thereby suffered a tangible loss. We therefore hold that there was substantial evidence to support the trial court's finding on the increased costs due to deterioration.

The judgment of the trial court is affirmed.

CRANDALL, P.J., and KELLY, J., concur.